ROBERT C. RYAN (Nevada Bar No. 7164)
TIMOTHY A. LUKAS (Nevada Bar No. 4678)
JOSHUA M. HALEN (Nevada Bar No. 13885)
**HOLLAND & HART LLP**
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Tel: (775) 327-3000 | Fax: (775) 786-6179
rcryan@hollandhart.com
tlukas@hollandhart.com
jmhalen@hollandhart.com

PAUL D. SWANSON (Colorado Bar No. 50923)
NICHOLAS W. KATZ (Colorado Bar No. 55136)
**HOLLAND & HART LLP**
555 17th Street, Suite 3200
Denver, Colorado 80202
Tel: (303) 295-8000 | Fax: (303) 479-9424
pdswanson@hollandhart.com
nwkatz@hollandhart.com
*Pro hac vice* motions forthcoming

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KOIN MOBILE, LLC, a Nevada limited liability company,<br><br>                    Plaintiff,<br><br>v.<br><br>EVERI HOLDINGS INC., f/k/a Global Cash Access Holdings, Inc., a Delaware Corporation, and EVERI PAYMENTS INC., f/k/a Global Cash Access, Inc., a Delaware Corporation,<br><br>                    Defendants. | **COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT §§ 1 & 2, THE CLAYTON ACT § 3, AND THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.060**<br><br><br>**JURY DEMAND** |

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

## TABLE OF CONTENTS

Page:

NATURE OF THE CASE ...................................................................................................1

PARTIES, JURISDICTION, AND VENUE ......................................................................5

GENERAL ALLEGATIONS .............................................................................................7

    A.    Traditional Dominance of Cash in the Gaming Industry ..........................7

    B.    Everi's Dominance Over Cash-Access Systems.........................................8

    C.    Digital Wallets' Threat to Cash-Based Gaming .......................................9

    D.    The Rise of Digital Wallets and Koin's Leading Product .......................12

    E.    Everi's Collaboration with, and Then Exclusion of, Koin.....................15

    F.    Everi's Long-Term, Exclusive Tying Agreements.................................17

    G.    Everi's Forthcoming Merger with IGT .................................................20

ANTITRUST ALLEGATIONS........................................................................................21

    A.    Relevant Markets ....................................................................................22

    B.    Anticompetitive Conduct ........................................................................29

    C.    Market Power ..........................................................................................33

    D.    Antitrust Injury and Standing .................................................................38

FIRST CLAIM FOR RELIEF Sherman Act Section 1, Clayton Act Section 3, *Per Se* Unlawful Restraint of Trade – Tying ...................................................40

SECOND CLAIM FOR RELIEF Sherman Act Section 1, Clayton Act Section 3, Unreasonable Restraint of Trade – Tying .......................................42

THIRD CLAIM FOR RELIEF Sherman Act Section 1, Clayton Act Section 3, Unreasonable Restraint of Trade – Exclusive Dealing .........................43

FOURTH CLAIM FOR RELIEF Sherman Act Section 2, Attempted Monopolization ..............45

FIFTH CLAIM FOR RELIEF Sherman Act Section 2, Monopolization......................................47

SIXTH CLAIM FOR RELIEF Nevada Unfair Trade Practices Act, *Per Se* Unlawful Restraint of Trade – Tying ...................................................48

SEVENTH CLAIM FOR RELIEF Nevada Unfair Trade Practices Act, Unreasonable Restraint of Trade – Tying ...................................................49

EIGHTH CLAIM FOR RELIEF Nevada Unfair Trade Practices Act, Monopolization and Attempted Monopolization ...............................................................51

JURY DEMAND .............................................................................................................52

PRAYER FOR RELIEF ..................................................................................................53

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

i

Plaintiff Koin Mobile, LLC ("Koin"), by and through its attorneys, Holland & Hart LLP, alleges against Defendants Everi Holdings Inc. and Everi Payments Inc. (collectively, "Everi") the following:

## NATURE OF THE CASE

1.      Americans love to gamble, and they particularly enjoy doing so in casinos. Historically, that has required some form of cash, so billions of dollars in cash-access transactions are processed each year in casinos nationwide.

2.      Everi has contracted with an overwhelming majority of casino operators, including many of the largest gaming institutions, so that it now controls the vast majority of cash-access transactions in U.S. land-based casinos.

3.      According to estimates by gaming cash-access insiders, Everi has taken control of roughly 75% to 90% of these transactions.

4.      Indeed, by its own account, Everi is the "dominant market leader" for cash-access systems at U.S. casinos. It reports delivering $25 billion to casino floors in 2017, more than $30 billion in 2019, and more than $40 billion in 2022, when land-based commercial casino gaming, however funded, generated only about $45 billion in revenue.

5.      But this action is not about Everi's dominance in the markets for cash access at casinos; this action is about Everi's abuse of its power over cash access to stifle competition, through tying and exclusive dealing, with the specific aim of dominating the nascent markets for digital wallets.[1]

6.      Digital wallets are a new technology in the gaming industry, which is often slow to adopt technological advances due to, among other things, the industry's highly regulated nature and the great need for security and reliability in the unique field of gaming and related financial transactions. Akin to PayPal, Venmo, or ApplePay in the non-gaming world—but with added features for security and casino management—digital wallets allow casino patrons to fund their in-casino gaming by linking external funding sources (e.g., credit cards, bank accounts,

---

[1] Throughout the complaint, the term "digital wallet" is used to refer to digital wallets that support gaming, including the extensive backend systems that support the wallets' operation.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

casino markers, etc.) to, for example, an app on their smartphone that can then interface with casino-management systems ("CMS") to directly fund gaming without the need for cash.

7.      In this way, a patron has a quick, convenient, and secure way to obtain funds for gaming without ever leaving her seat at the gaming table.

8.      For casinos, digital wallets provide a cheaper funding alternative to cash, along with better customer-service tools, security features, patron oversight, and systems interoperability.

9.      In comparison to cash, digital wallets generally enhance the casino-floor experience by facilitating low-friction financial transactions with tailored controls for patrons and casinos alike.

10.     Several companies have developed digital wallets in recent years, and Koin's digital wallet—the Koin Wallet—stands out with unique features that benefit both casinos and their patrons.

11.     For example, most gaming wallets are predicated on a treasury-management approach for account distribution, meaning they can't be used seamlessly across gaming verticals or in non-casino retail stores. The Koin Wallet, on the other hand, serves as a general-purpose digital wallet that can be used anywhere major credit cards are accepted. This comes with the added benefit of increasing customer access to blended rewards and loyalty programs.

12.     Additionally, unlike other digital wallets that hold customer funds in omnibus accounts or accounts managed by the casino operator, funds stored in Koin's digital wallet are held in individualized accounts with Sutton Bank. This means that casino patrons with Koin's digital wallet can use it at most retail locations, pair it with major credit cards, and enjoy the protection of FDIC insurance for their individual accounts, which competing casino-treasury-based digital wallets do not provide.

13.     Recognizing the immense potential in cashless gaming and concerned about the ongoing value of its dominance over cash access, Everi developed its own digital wallet—the CashClub Wallet.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

2

14.     But Everi's digital wallet, which is not a general-purpose wallet like Koin's and may be used only in casinos, is less convenient for users, more expensive, and offers fewer and inferior features compared to the Koin Wallet.

15.     Unable to dominate a competitive digital-wallet market, Everi has adopted an anticompetitive strategy to stifle competition and lock up emerging digital-wallet markets by forcing casinos and, by extension, their patrons into long-term exclusive use of the CashClub Wallet as a condition of using Everi's cash-access systems.

16.     As its Executive Vice President Darren Simmons explained, Everi has "spent the better part of the last decade tying products and services together across hundreds of land-based casinos" and is "uniquely positioned to leverage [Everi's] physical infrastructure within casinos . . . to create a digital journey for players."

17.     As relevant here, Everi has executed a tying strategy by which it imposes on casinos a complex, exclusive adhesion contract for cash-access products—lasting for a minimum of five years with automatic renewals, rights of first refusal, and onerous forfeiture provisions— and sneaks or otherwise forces its cashless or "quasi-cash" products into the long-term exclusive arrangement, as a condition to receiving Everi's cash-access products.

18.     For example, in 2023, Everi demanded that its cash-access customer Baldini's Sports Casino ("Baldini's") break its agreement to use Koin's digital wallet and an integrated, cashless casino-credit function called Moolah Play, provided by Koin's corporate affiliate Marker Trax, LLC ("Marker Trax"). Everi invoked provisions in its cash-access contract with Baldini's that imposed a five-year exclusive term for use of Everi's cash-access systems *and* that tacked on parallel exclusivity for any "quasi-cash" products, which, according to Everi, prohibited Baldini's from contracting with Koin or Marker Trax, or any other third parties, for digital-wallet products.

19.     Everi has used the same tactics against Koin in other local gaming markets across the country, insisting that Everi's cash-access contracts preclude casinos from using any digital wallet other than Everi's. In this way, Everi has coerced casinos—and by extension their

3

patrons—either to give up using the Koin Wallet or to never consider adopting it in the first place.

20.     The same dynamic has played out against other digital-wallet providers, besides Koin, with Everi using its cash-access contracts to force casino operators into long-term exclusive contracts for Everi's digital wallet.

21.     In short, through anticompetitive tying and exclusive-dealing contracts, Everi has forced casinos and their patrons, who are locked in through casino-loyalty programs and a general lack of information, into using only Everi's digital wallet—or no digital wallet at all.

22.     Everi has thus ported its dominant market share in the cash-access markets to the markets for digital wallets.

23.     Yet Everi is not content with merely a dominant share of the digital-wallet markets. It seeks total monopoly.

24.     Everi recently announced a merger with gaming giant and digital-wallet provider International Game Technology ("IGT") to create a combined business worth approximately $6.2 billion. This merger will cement Everi's control over the markets for digital wallets.

25.     IGT provides CMS products to a significant share—well over 20%—of casino operators, many of which are not presently locked into a relationship with Everi.

26.     Like an operating system for a computer, a CMS is integral to all casino activities and is not easily replaced. Moreover, IGT determines which digital wallets may interface with its CMS, giving IGT and its Resort Wallet entrenched control over digital-wallet use in every casino that contracts for IGT's CMS products.

27.     By merging with IGT, Everi will expand its control over the markets for digital wallets to include not only Everi's dominant share of cash-access customers, but all of IGT's CMS customers, too. The post-merger Everi will thus have far-reaching control over the digital-wallet markets, with the ability unilaterally to lock in customers, lock out competitors, and increase pricing to casinos and patrons while delivering a sub-par product.

28.     Through the above actions, Everi has substantially affected commerce and foreclosed competition in the markets for digital wallets, and it has obtained market power to

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

such an extent that it is dangerously close to monopolizing those markets, if it has not achieved monopoly power already.

29.     Specifically, Everi has wrought substantial injury to competition in the markets (i) for digital wallets for casinos nationwide, which have lost the ability to choose their preferred digital-wallet provider and face higher transaction charges from Everi and diminished casino-management tools, and (ii) for digital wallets for casino patrons who are likewise deprived of better alternatives to Everi's digital wallet and forced to pay transaction fees that exceed those in competitive digital-wallet markets.

30.     Everi's anticompetitive conduct also has wrought substantial injury on Koin and other digital-wallet providers in the form of lost business opportunities and lost profits.

31.     Everi's actions spurn fair competition, violate the law, and must be stopped by judicial action to prevent further harm to competition and to casinos and their patrons. This lawsuit seeks to vindicate robust competition among digital-wallet providers as casinos and patrons file into these burgeoning markets, and to recover the damages Everi has caused Koin.

32.     Based on Everi's misconduct, Koin asserts claims for unlawful tying and exclusive dealing under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14; monopolization and attempted monopolization under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; and unfair trade practices under the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.060.

33.     In addition to seeking an injunction against Everi's unlawful tying and exclusive dealing under Section 16 of the Clayton Act, 15 U.S.C. § 26, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 598A.210 of the Nevada Unfair Trade Practices Act, Koin seeks its actual damages, trebled, based on Everi's violation of antitrust laws.

34.     Pursuant to statute, Koin also seeks an award of its reasonable attorneys' fees and costs in prosecuting this action.

## PARTIES, JURISDICTION, AND VENUE

35.     Plaintiff Koin Mobile, LLC, was founded in 2021 and operates from Las Vegas, Nevada. Koin markets a digital-wallet product, the Koin Wallet, that provides casinos and

patrons with new ways to manage transactions, both gaming and otherwise, improving the consumer experience in an industry that historically has been dominated by cash.

36.     Defendant Everi Holdings Inc. (f/k/a Global Cash Access Holdings, Inc.) ("Everi Holdings") is a corporation organized and existing under the laws of the State of Delaware. Everi Holdings has its principal place of business at 7250 S. Tenaya Way, Suite 100, Las Vegas, Nevada 89113. It does business in this judicial district and state and elsewhere throughout the United States.

37.     Defendant Everi Payments Inc. (f/k/a Global Cash Access, Inc.) ("Everi Payments") is also a corporation organized and existing under the laws of the State of Delaware. Everi Payments also has its principal place of business at 7250 S. Tenaya Way, Suite 100, Las Vegas, Nevada 89113. It does business in this judicial district and state and elsewhere throughout the United States.

38.     Everi Holdings caused its name to be changed from Global Cash Access Holdings, Inc. effective August 24, 2015. Everi Payments caused its name to be changed from Global Cash Access, Inc. effective August 24, 2015.

39.     Everi Holdings is a holding company. The assets of Everi Holdings include the issued and outstanding shares of capital stock of Everi Payments.

40.     Everi Holdings is traded on the New York Stock Exchange.

41.     Everi Holdings makes no cognizable distinction, nor does it attempt to make any distinction, by and between itself and Everi Payments. Everi Holdings has referred to itself and "its consolidated subsidiaries" (including Everi Payments) as "the 'Company,' 'we,' 'us,' and 'our,'" in Securities and Exchange Commission filings as recently as its Form 10-K for the fiscal year ended December 31, 2022.

42.     Koin believes that Everi Holdings and Everi Payments (including any respective predecessors in interest)—either individually or in concert with one another—engaged in each and every one of the anticompetitive acts set forth herein. More specifically, Koin does not believe that either Everi entity undertook any of said actions without the knowledge, ratification, and express or inherent authorization of the other. For each and every allegation and cause of

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

6

action set forth herein, Koin seeks recovery from either or both of the Everi entities, and it refers to them collectively as "Defendants" or "Everi."

43.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under the federal antitrust statutes.

44.    The Court's jurisdiction over Koin's supplemental state law claims is authorized by 28 U.S.C. § 1367.

45.    The Court has personal jurisdiction over Everi because its headquarters and principal operations are in Nevada.

46.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Everi resides in this district, and in the unofficial division of this Court in Reno, pursuant to LR IA 1-8(a), because Everi's anticompetitive actions emanated in part from the territory encompassed by this division.

## GENERAL ALLEGATIONS

**A.    Traditional Dominance of Cash in the Gaming Industry**

47.    Casino gaming historically has been a cash-fueled industry. Even today, although patrons no longer walk around the casino floor with a bucket of quarters, gameplay is still driven by cash access.

48.    But due to regulatory constraints, standard cash-access options generally are not available on casino floors. The gaming industry is subject to extensive federal, state, and local laws, rules, and regulations enforced by official entities. This oversight aims to ensure that gaming and related services are provided honestly and free of corruptive elements. The regulations also seek to protect consumers, financial institutions like banks, and the viability of the gaming industry by maintaining public confidence, preventing cheating and fraud, and establishing and maintaining responsible accounting practices and procedures through controls over financial transactions and recordkeeping. So casinos turn to specialized options to ensure a steady flow of convenient and compliant funds for patron gaming.

49.    Specifically, casinos contract with third parties to provide gaming-specific kiosks and other specialized cash-access systems intended for use in casinos "in house" and on the

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

gaming floor. The gaming-specific kiosks are self-service machines that allow patrons to withdraw cash from their bank accounts, take a cash advance on their debit or credit cards, or purchase tickets or vouchers that can be redeemed for cash or its proxy—gaming chips—at the casino cage. These gaming-specific kiosks and related cash-access systems allow patrons to withdraw money and continue to pay for goods and services and otherwise engage in entertainment experiences at the casino, even after reaching the daily allowed withdrawal limit for a particular account.

50. These third-party systems also reduce a casino's labor costs, ease and accelerate patron access to cash and chips, and increase the amount of currency a patron can access in a given day. Without such self-service kiosks and other systems, casinos would force their patrons to come to the casino with cash in hand and would need additional employees to handle cash- or chip-access services. Slower access to funds, and limits on funds, would in turn decrease the pace and volume of patron gaming, which would adversely affect the profitability and viability of casinos and the range of choices for patrons.

51. These highly regulated gaming-specific kiosks and related cash-access systems also integrate with casino management and accounting systems by utilizing specialized software programs.

**B.    Everi's Dominance Over Cash-Access Systems**

52. Everi is the dominant provider of cash-access systems for the gaming industry, including cash-advance transactions, ATM transactions, and check services. Everi touts its domination of the gaming cash-access markets: "No single supplier in the gaming industry processes more financial access transactions than Everi—over $42 billion from more than 125 million transactions in 2022."

53. Everi's dominance of the markets for cash-access systems in the gaming industry is not new. In 2008, according to estimates by gaming cash-access insiders, Everi controlled approximately 75% of the gaming cash-access transactions. Thanks to aggressive corporate acquisitions, in 2009, Everi increased its market share to roughly 90% on the back of more than

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

$20 billion in cash-access transactions at more than 1,100 casinos, including the ten largest gaming companies in the United States.

54.     Today, Everi continues to process the vast majority of cash-access transactions at U.S. casinos each year, clearing a volume that nearly equals the total revenue from land-based casino gaming in the United States, and likely will approach or even exceed $50 billion this year.

55.     Having cornered the market on cash-access systems in the gaming industry, Everi aggressively locked in its dominant market position through long-term exclusive dealing agreements with casinos, binding them to Everi's cash-access systems—and only Everi's cash-access systems—for five-year terms with automatic renewals and rights of first refusal, which makes Everi's rights effectively indefinite. Everi's conduct has enhanced its dominant position in the gaming cash-access markets.

56.     Everi generates revenue by charging service fees for transactions utilizing its cash-access systems. Thus, the fewer transactions, the less Everi makes.

57.     So the burgeoning market for digital wallets poses an existential threat to the value of Everi's dominance over gaming cash access: more casinos and patrons using digital wallets means fewer casinos and patrons using Everi's cash-access systems.

**C.      Digital Wallets' Threat to Cash-Based Gaming**

58.     That threat is real because the cash economy has drawbacks for casinos and patrons that digital wallets overcome.

59.     Large casinos typically keep upwards of $1.5 *billion* in cash on premises at all times, which is no easy feat. Cash is burdensome, bulky, susceptible to spoilage, and prone to internal and external theft. Cash is hard to track and manage, and using cash at a casino requires multiple steps—obtaining the cash and then exchanging for chips to play, and then the reverse to cash out when play is complete—and those manual steps each take time.

60.     Thus, as tools have been developed to reduce cash use in casinos, casinos have—contrary to popular conception—come to lose their love for cash and have instead become interested in ways of reducing cash usage in the gaming industry.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

9

61.     That interest accelerated with the COVID-19 pandemic. Industry surveys showed that health concerns made casino patrons less likely to use cash in their everyday lives, which generated demand for digital payments on the casino floor. Casinos were thus more motivated than ever to find a viable alternative to cash-based systems.

62.     Enter digital wallets.

63.     At its simplest, a digital wallet is a smartphone application that runs in conjunction with an elaborate backend software system at a casino. Through the app, a patron connects to his or her debit or credit card, PayPal, or other payment sources to fund the wallet. The patron can then use those funds from the smartphone app at participating casinos, which implement the digital-wallet provider's backend software system to support the patron's use of the app.

64.     Digital wallets enhance the patron experience. They allow a patron to fund game play from his phone, without the disruption of using a self-service kiosk or other cash-access system. Thus, a patron need not give up her favorite slot game or his preferred seat at the blackjack table, and that patron need not worry about the risks of carrying cash—loss, theft, miscounting, and more.

65.     With digital wallets, patrons also enjoy the ability to self-impose sticky spending caps that apply across all the funding sources consolidated in their digital wallet, and they benefit from security features like remote identity verification and enrollment for loyalty rewards programs and payments, two-factor and biometric authentication, and geolocation confirmations.

66.     And digital wallets are efficient: patrons can use one tool for all payments and purchases at the casino resort, drawing from all interoperable funding sources—credit cards, bank accounts, ACH, casino credit, PayPal, and more—without having to expose their funding sources directly to a casino, or vice versa.

67.     At base, digital wallets benefit patrons by dramatically decreasing their "time to play," the key metric to patron adoption of cashless technology.

68.     This dynamic benefits casinos too, which realize increased spending and game lift that accompany quicker and easier patron access to funds.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

69.     And through digital wallets, which consolidate a patron's various funding sources, casinos have a single pinch-point to report, throttle, or even cut off problematic gaming without resorting to embarrassing—and often dangerous—personal confrontations with patrons.

70.     Digital wallets also can seamlessly integrate a casino's CMS with the backend software of their digital-wallet provider and thereby more efficiently manage patron loyalty programs, track patron spending patterns, tailor gaming and entertainment offerings to those patterns, and head off illicit financial activity.

71.     By offloading administrative tasks to a digital wallet, casinos free up their resources to improve the patron experience with better infrastructure, better service, and better entertainment options.

72.     Digital wallets also include casino-focused features such as detailed spend tracking and record-keeping, enhanced Know Your Customer (KYC) capabilities, and anti-money laundering benefits. Casinos, whose regulators require them to use all means available to report suspicious financial transactions, benefit from more robust tracking and reporting tools that can readily identify structured transactions and minimum-gaming withdrawals. These are critically important to the gaming industry to promote responsible gaming and to detect and stop illicit financial activity.

73.     Casinos with digital-wallet systems also can reduce their cash reserves, which in turn reduces the labor, transportation, accounting, insurance, and security costs that casinos bear to mitigate their cash risks—theft, laundering, and run-of-the-mill loss that accompanies tracking millions of pieces of paper currency.

74.     The reduction of cash-related theft and other crimes has the secondary benefit of improving the gaming experience for patrons and enhancing the reputation of casinos and the gaming industry as a whole—less vice, more entertainment.

75.     The American Gaming Association supports the development of digital payment technology, as it can (i) equip casino patrons with digital tools to help them monitor their gaming and set spending limits to wager responsibly, (ii) allow customers to make gaming and non-gaming transactions in a form that is convenient and gives them choice, (iii) reduce friction

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

11

between gaming and non-gaming segments of an integrated resort, (iv) avoid the risk associated with patrons carrying large amounts of cash, (v) help casinos identify problem gambling behavior and enhance law enforcement's ability to identify and stop illegal activity, (vi) address heightened customer public health concerns related to using cash on the gaming floor following the COVID-19 pandemic, and (vii) boost customer confidence in digital payment security.

76. Like emails replaced most letters, digital wallets are poised to replace nearly all cash-based elements of casino play and other activities: no more (or at least far fewer) cash vaults, gaming kiosk withdrawals, ticket-voucher exchanges, and physical currency placed into cash counters, slot machines, and attendants' hands.

**D.    The Rise of Digital Wallets and Koin's Leading Product**

77. In June 2020, the Nevada Gaming Commission approved regulations authorizing the use of digital payments for gaming.

78. The following year, a dedicated team of industry experts, technologists, and visionaries founded Koin. Their goal was to redefine the gaming payment experience by delivering cutting-edge solutions to enhance patron satisfaction and optimize operational efficiency and profitability for casinos.

79. To that end, Koin assembled a diverse group of professionals, including experts from the gaming and payments industry, regulatory-compliance specialists, and fintech developers. With decades of combined experience in gaming, financial services, payments, and tech development, Koin was well-situated to pioneer the market for digital wallets.

80. Koin's team developed Koin Wallet and its supporting back-end systems with convenient mobile-wallet accounts sponsored by Sutton Bank, an FDIC-insured and federally regulated financial institution. Koin designed the Koin Wallet systems to provide the fastest, most secure, and most economical way for users to fund casino gameplay or make retail purchases anywhere, anytime, using their iOS and Android devices.

81. Koin Wallet serves as a mobile account that users can easily fund from one of the many available loading options. Payroll deposits, debit, credit, Venmo, Apple Pay, Google Pay,

**HOLLAND & HART** LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

and cash loads are immediately available, while casino-sponsored credits may require short processing times and ACH/bank transfers may take a few days for the funds to clear.

82.    The funds in Koin Wallet can then be used to directly fund casino gameplay or to make retail purchases. Users can make payments from Koin Wallet via QR code, virtual MasterCard, a physical MasterCard, Moolah Play, or a "send to friend" option.

83.    Koin Wallet thus provides a convenient, quick, and secure way to fund casino gameplay without ever having to leave the machine or table and can be fully integrated with the CMS provider's regulated gaming and cashless wagering system, ensuring smooth and secure transactions.

84.    Although Koin Wallet is not the only digital wallet available in the gaming industry, it has certain unique features that separate it from its competitors.

85.    First and foremost, Koin Wallet is a general-purpose wallet, as opposed to a gaming-specific wallet like Everi's and IGT's, so it can be used anywhere that accepts MasterCard and Visa.

86.    Most digital wallets, including Everi's and IGT's, cannot support non-gaming financial transactions because they are simply treasury-management tools for the casinos that use them. These kinds of accounts are strictly regulated in the gaming industry, and the digital wallets therefore are not capable of general use outside casinos.

87.    Other digital wallets are hybrids, utilizing a general-purpose wallet that incorporates a gaming-specific sub-wallet. Although these support both gaming and non-gaming activity, they are clunky and cumbersome for a user who must first transfer funds to the general-purpose wallet and then, separately, to the segregated gaming sub-wallet, all of which wastes time and can implicate additional fees.

88.    In contrast to these treasury-management and hybrid digital wallets, the Koin Wallet taps patron funds that reside in individualized accounts at Sutton Bank rather than on a casino's ledger or in an omnibus account held by the digital-wallet provider. Koin Wallet therefore offers the best of all worlds, with no wall between its general-purpose and gaming features, resulting in increased convenience, fewer fees, and a better user experience. Users can

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

13

spend their funds at most retail locations, pair their Koin Wallet to major credit cards, enjoy the security of FDIC backing on their accounts, and take advantage of blended rewards and loyalty programs.

89.     Koin Wallet also can be integrated directly into existing casino mobile apps or delivered as a stand-alone application. This flexibility allows casino operators to choose the implementation method that best suits their needs and infrastructure.

90.     Additionally, Koin Wallet provides comprehensive auditability for both patrons and casino operators. Through robust reporting features, users can monitor and analyze funds flow, transaction history, and account activity, ensuring transparency and accountability.

91.     As noted above, another Koin Wallet feature is its integration of Moolah Play. This tool, offered by Koin's corporate affiliate Marker Trax, is a cashless, digital alternative to casino markers.

92.     A traditional casino marker is a short-term line of credit that casinos offer customers to use for gambling. Moolah Play is the digital equivalent, a patented casino advance-line system that allows patrons to apply for credit that can be accessed directly through the Koin Wallet and used at a slot machine or table.

93.     Koin Wallet and Marker Trax announced their partnership in September 2022 and debuted their integrated product at the Global Gaming Expo in October 2022 in Las Vegas. Koin Wallet and Marker Trax officially launched to the public later in 2022, starting at the Ellis Island Hotel & Casino in Las Vegas.

94.     Patrons enjoy more visibility into credit decisions through Koin Wallet and Moolah Play, and they can more readily track their use, charges, and balances for credit.

95.     With Moolah Play through the Koin Wallet, casinos can outsource credit applications, credit review, and credit approval. They can get casino-credited funds to patrons more quickly and obtain repayments more easily, including by automatically collecting funds at the end of each gaming session before any cash-out event (e.g., before the patron withdraws physical currency or transfers a balance to an external account).

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

14

96.     Casinos that utilize Moolah Play through the Koin Wallet also can restrict the use of credited funds to gaming or other on-site activities. Traditional markers are readily exchangeable for cash that patrons can take offsite to spend elsewhere, leaving casinos with the credit risk of the outstanding marker but not the corresponding benefit of increased business from the patron. Koin Wallet with Moolah Play closes that loophole.

97.     Based on these benefits, Moolah Play is in high demand by both casino operators and casino patrons. Indeed, before its recent dispute with Koin and Marker Trax over digital wallets at Baldini's, Everi sought to partner with Marker Trax to provide its product through the Everi CashClub Wallet.

**E.      Everi's Collaboration with, and Then Exclusion of, Koin**

98.     With digital wallets threatening the value of its cash-access dominance, Everi had to either develop a competitive digital-wallet product or find some way to restrain competitors in the digital-wallet markets and restrict output.

99.     Initially, Everi sought to collaborate with Koin to develop a competitive digital wallet.

100.    In late 2021, Everi asked to license certain Koin technology and engaged Koin in ongoing discussions and meetings throughout 2022 regarding a potential software license and development agreement.

101.    As part of these discussions. Everi elicited proprietary information from Koin about its digital-wallet technology.

102.    During their discussions, Everi assured Koin it would support the use of Koin Wallet in casinos that partner with Everi for cash-access systems.

103.    But at the end of 2022, having gleaned the information it sought from Koin, Everi abruptly abandoned the collaboration.

104.    Apparently, Everi concluded that Koin threatened its dominance of in-casino financial access.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

15

105.    This threat grew in June 2023 when Koin and Marker Trax announced a digital-wallet partnership with Baldini's in Sparks, Nevada, just east of Reno. This was the first casino in northern Nevada to introduce flexible, cashless wagering through digital wallets.

106.    Baldini's is a favorite of locals in the Reno area, offering more than 500 slots and video poker games, Keno, sports betting, and more, so the Baldini's–Koin partnership marked an important milestone for both entities and for the evolution of digital wallets in the gaming industry.

107.    With its cash-access monopoly at risk of obsolescence and its CashClub Wallet unable to compete on its merits, Everi sought to squelch competition from Koin and Marker Trax.

108.    Everi insisted that Baldini's contract with Koin and Marker Trax violated Everi's long-term exclusive cash-access and "quasi-cash" contract with Baldini's, and it demanded that both sides abandon their partnership. According to Everi, those quasi-cash rights entailed exclusive rights to provide a digital wallet at Baldini's.

109.    Thus, according to Everi, Baldini's was in breach of its contract with Everi, and Koin was an accomplice in violating Everi's long-term, exclusive contract that tied cash-access and digital wallets.

110.    Everi's use of anticompetitive contract terms has extended across the country and restrains competition by Koin and other digital wallet providers.

111.    For example, when Koin contracted with Eureka Casino in Las Vegas ("Eureka") to offer the Koin Wallet to Eureka's patrons, Everi claimed that its cash-access contract rights precluded Eureka from offering Koin's digital wallet to patrons. In this way, Everi coerced Eureka into rescinding its contract with Koin.

112.    Similarly, Everi blocked Pavilion Payments—another would-be digital-wallet competitor—from partnering with a large casino operator by insisting that Everi's long-term exclusive cash-access and digital-wallet contract precluded Pavilion from offering its digital wallet.

113.    Across the country, Everi has locked up the nascent digital-wallet markets and stymied competition from Koin and other competitors by insisting that its cash-access customers are prohibited from using any digital wallet but Everi's.

**F.      Everi's Long-Term, Exclusive Tying Agreements**

114.    Everi locks in and expands its market power by imposing standard-form contracts on casinos that utilize its cash-access systems (the "Everi Contracts").

115.    The Everi Contracts are centered on a Master Services Agreement ("MSA") that encompasses separate "Service Schedules" with the specific terms and conditions of use for Everi's various cash-access and related systems. The MSA appoints Everi as the "sole and exclusive provider of each Service" to the contracting casino and precludes the contracting casino from "allow[ing] any other party to provide any service that is substantially similar to any Service being provided by [Everi]."

116.    While the MSA provides Everi with extensive termination rights, the contracting casino has no right to terminate. Instead, it must adhere to the MSA until either Everi terminates or the terms of all Service Schedules expire. The Service Schedules, as amended, are for an initial term of 5 years, with automatic renewals for subsequent three-year terms unless either party elects not to renew. But upon the expiration or termination of any Service Schedule, Everi has the right of first refusal to provide the applicable systems to the contracting casino on financial terms and conditions no less favorable to the casino than the financial terms and conditions offered by alternate providers.

117.    As a result of these terms, Everi has the right to continue its contracts indefinitely, and the contracting casinos have no ability to cease the relationship unless Everi agrees.

118.    If contracting casinos terminate the Everi Contracts prematurely, in addition to whatever damages Everi might claim for breach, the casinos must repay all bonuses that Everi provided to induce them to contract, and they may not obtain refunds for the costly Everi-specific equipment the Everi Contracts require them to acquire from Everi—acquisitions totaling hundreds of thousands, if not millions, of dollars.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

17

119. The threat of damages and these onerous forfeiture provisions reinforce the long-term exclusivity provisions imposed by the Everi Contracts.

120. Moreover, if a contracting casino (or an entity controlled or owned by the contracting casino or under common control or ownership with the contracting casino) constructs or develops a new casino, that casino is automatically required to utilize the systems Everi provides.

121. Similarly, if a contracting casino acquires a new casino supported by an alternate provider of any service, product, or equipment that is substantially similar to any service, product, or equipment provided by Everi, that casino is required to take all feasible steps to terminate the alternate provider and work with Everi.

122. The Cash Access Services Schedule controls Everi's business of facilitating cash-access transactions for the contracting casino's patrons.

123. For each patron transaction utilizing Everi's cash-access systems, the patron is charged a cardholder fee by Everi. For debit card transactions, the cardholder fee is generally a few dollars, plus a fixed percentage of the cardholder-requested dollar amount. For credit card transactions (*i.e.*, credit card cash advances), the cardholder fee increases with the cardholder-requested dollar amount, ranging from a $5 or $6 dollar minimum for transactions under $50 to over $100 for transactions above $2,500, and maxing out at a percentage fee (*e.g.*, at least 3%) of the cardholder-requested dollar amount for transactions over $5,000.

124. These fees and charges are in addition to whatever fees and other charges the patron's bank or credit card company imposes on the transaction. Thus, for a $50 withdrawal, a patron easily could face $10 or more—i.e., above 20% of the transaction value—in fees and charges even before accounting for interest charges on the withdrawn amount.

125. Everi collects the cardholder fees from each transaction, retains a commission that varies depending on the transaction, and remits the remainder of the cardholder fee to the contracting casino.

126. And in contrast to its casino partners, who may not terminate their long-term exclusive contracts with Everi, Everi has the right unilaterally to modify the terms of the contracts

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

18

to increase service fees and other charges. So even if a casino determines that excessive fees and charges harm its ability to attract patrons, the casino cannot exercise its independent judgment or bargaining power to ensure competitive terms for its patrons.

127.    In light of Everi's dominance over the cash-access markets in U.S. land-based casinos, the volume of transactions it processes are immense. For example, in 2022, Everi processed more than 125 million transactions for over $42 billion in total. Earning a significant commission on each transaction, Everi has reaped the profits from its market dominance.

128.    According to its Form 10-K filing, in 2022, Everi realized more than $206 million in revenues from financial access services on just $10 million in costs—an astounding 95% margin from that business line:

| | December 31, 2022 | |
| --- | --- | --- |
| | $ | % |
| **Revenues** | | |
| **Games revenues** | | |
| Gaming operations | $    292,873 | 37 % |
| Gaming equipment and systems | 143,553 | 18 % |
| **Games total revenues** | 436,426 | 56 % |
| **FinTech revenues** | | |
| Financial access services | 206,860 | 26 % |
| Software and other | 80,232 | 10 % |
| Hardware | 59,001 | 8 % |
| **FinTech total revenues** | 346,093 | 44 % |
| **Total revenues** | 782,519 | 100 % |
| **Costs and expenses** | | |
| **Games cost of revenues** [1] | | |
| Gaming operations | 25,153 | 3 % |
| Gaming equipment and systems | 86,638 | 11 % |
| **Games total cost of revenues** | 111,791 | 14 % |
| **FinTech cost of revenues** [1] | | |
| Financial access services | 10,186 | 1 % |
| Software and other | 4,125 | 1 % |
| Hardware | 39,220 | 5 % |
| **FinTech total cost of revenues** | 53,531 | 7 % |

129.    But the rising digital-wallet markets threaten to relegate cash-access kiosks to history's trash heap of payphones and typewriters.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

130.    To ensure its staggering profits in the cash-access markets are not undercut or diluted, Everi has used its contracts to exclude competitors from the digital-wallet markets and force the exclusive use of its CashClub Wallet.

131.    Specifically, in addition to making Everi the exclusive provider of cash-access systems to contracting casinos, the Everi Contracts also force casinos to use Everi as their exclusive provider of "quasi-cash" systems, which, according to Everi, include digital wallets. This tie between cash access and digital wallets replicates Everi's dominant market power over cash access in the burgeoning digital-wallet markets.

132.    Everi thus stands to benefit whether the digital-wallet markets grow, with Everi on top, or stagnate, with the value of Everi's cash-access dominance undiluted.

## G.    Everi's Forthcoming Merger with IGT

133.    Everi, however, is not satisfied with mere market power over the digital-wallet markets. As Everi's Executive Chairman Michael Rumbolz characterized the company's strategy in 2017, "even though we already have a dominant industry position, we expect to not just maintain our leadership, but to extend it."

134.    In keeping with that approach, on February 29, 2024, Everi announced a merger with IGT in a deal valuing the combined business at approximately $6.2 billion. Everi intends the combination to create "a comprehensive global gaming and FinTech enterprise," deemed by analysts to be "a one-stop show across land-based gaming, igaming, sports betting, and financial technologies." The combined company is projected to generate $2.7 billion in pro forma revenue in 2024 and $1 billion in adjusted EBITDA. The merger is expected to close in late 2024 or early 2025.

135.    IGT is currently the CMS provider for a substantial share—more than 20%—of casino operators, many of which do not overlap with casinos Everi already serves.

136.    Because a digital wallet works hand in hand with a casino's CMS software, and because casinos cannot and do not readily switch CMS providers, acquiring IGT's CMS customers will enable Everi to obtain entrenched monopoly power over the casino and patron

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

20

markets for digitals wallets, with the power unilaterally and indefinitely to maintain and expand supracompetitive pricing for a sub-competitive product.

## ANTITRUST ALLEGATIONS

137.    Everi has executed anticompetitive agreements in order to foreclose competition, and it has intentionally acted to obtain, enhance, and maintain monopoly power, in two separate but interdependent relevant markets: (i) the market for digital-wallet systems for use by casinos in the United States (the "U.S. Casino Digital-Wallet Market") and (ii) the market for digital-wallet products for use by patrons at casinos in various local sub-markets across the United States (the "Local Patron Digital-Wallet Markets"). Together, these comprise the "Digital-Wallet Markets" in which Everi has restrained competition and harmed casinos, patrons, and competing providers like Koin.

138.    Everi has done so through exclusive contracts and by tying digital wallets to its power in two other interrelated markets: (i) the market for cash-access systems for casinos, which is a national market (the "U.S. Casino Cash-Access Market") and (ii) the market for cash-access for casino patrons, which are provided in various gambling submarkets (the "Local Patron Cash-Access Markets"). Together, these comprise the "Cash-Access Tying Markets."

139.    The Digital-Wallet Markets are distinct from the Cash-Access Tying Markets because the demand for cash and for digital wallets is inelastic—both casinos and patrons need on-site funding sources for gambling—yet the demand for each is not cross-elastic and therefore cash and digital wallets are not reasonably interchangeable substitutes for one another.

140.    Patrons who prefer cash will not switch to digital wallets based on a small but substantial increase in fees and other charges or in response to sub-competitive product, and the inverse is true for patrons who prefer digital wallets.

141.    Given this, casinos wish to offer products and services to meet demand in both markets, cash and digital wallets, and therefore require both options. And their demand for cash access and digital wallets is distinct in practice—e.g., Eureka meets its cash-access needs with Everi, and it wished to meet its digital-wallet needs with a separate provider, Koin (and would be freely doing so but for Everi's anticompetitive conduct).

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

142.   By flexing its market power in the Cash-Access Tying Markets, Everi has forced casinos to accept tying agreements and exclusive contracts for its CashClub Wallet—and thereby forced the CashClub Wallet on those casinos' patrons, too. In this way, Everi has substantially foreclosed competition in the Digital-Wallet Markets, and it has intentionally attempted to seize, enhance, and maintain monopoly power in the Digital-Wallet Markets. There is a dangerous probability it will succeed, if it has not obtained monopoly power already, and its forthcoming merger with IGT assures a monopoly.

143.   Everi has harmed competing digital-wallet providers by excluding them from the Digital-Wallet Markets generally, and it has specifically harmed Koin by acting to block Koin's existing partnerships with, among others, Baldini's and Eureka, as well as Koin's opportunity to compete for partnerships with other casinos for the provision of digital-wallet products.

144.   Everi has harmed competition and consumers by acting to restrain competition and restrict output from Koin and other digital-wallet providers that would otherwise compete to win business by offering better digital-wallet products and better terms for casinos and for patrons.

**A.    Relevant Markets**

145.   Everi is restraining competition in two relevant markets—the U.S. Casino Digital-Wallet Market and the Local Patron Digital-Wallet Markets.

146.   Everi carries out its anticompetitive conduct, in part, by leveraging its market power in the Cash-Access Tying Markets, which comprise the U.S. Casino Cash-Access Market and the Local Patron Cash-Access Markets.

147.   From the perspective of casinos and patrons, digital wallets are not reasonably interchangeable with cash access, which is why they are in separate markets.

148.   Likewise, since these products and services meet different needs as between casinos and patrons, there are separate, interdependent market divisions based on those distinct sources of demand:

**HOLLAND & HART** LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

22

| THE MARKETS | | Distinct Products | |
|---|---|---|---|
| | | Cash | Digital Wallet |
| Distinct Demand | Casino | **U.S. Casino Cash-Access Market** | **U.S. Casino Digital-Wallet Market** |
| | | <u>**Cash-Access Tying Markets**</u> | <u>**Relevant Digital-Wallet Markets**</u> |
| | Patron | **Local Patron Cash-Access Markets** | **Local Patron Digital-Wallet Markets[2]** |

149.     Everi's anticompetitive scheme emerged from the Cash-Access Tying Markets.

*The Cash-Access Tying Markets*

150.     There are two Cash-Access Tying Markets in which Everi enjoys market power that it uses to enforce an anticompetitive tie.

151.     In the U.S. Casino Cash-Access Market, cash-access providers compete, or should compete, to contract with casinos to provide cash-access systems at land-based casinos in the United States.

152.     Specifically, in exchange for the opportunity to obtain service charges and other fees from casino patrons who use cash-access systems, providers ensure a steady stream of funding for patrons to use while gambling in the casinos and give the casinos financial incentives and cash- and casino-management tools.

153.     Cash-access systems for casinos are a distinct market because cash continues to be the principle means of exchange in casinos for which demand is inelastic, and because traditional alternative cash providers, like banks, are not directly accessible within casinos by virtue of regulatory and commercial restrictions. The fact that casino cash-access systems occupy a different market than generic cash-access systems is evident from the higher charges on casino

---

[2] Everi also is restraining trade in a relevant aftermarket—the Everi-Casino Digital-Wallet Aftermarket—that exists as an alternative to the Local Patron Digital-Wallet Markets, as described more fully below.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

cash-access transactions and the variety of funding sources casino-cash-access systems tap in comparison to generic cash-access systems.

154.    It is a nationwide market because casinos can look to various U.S.-based casino cash-access providers to meet their needs, while foreign providers are excluded from the market due to regulatory restrictions that govern financial transactions at casinos.

155.    Interdependent with the casino-side market for cash access, the Local Patron Cash-Access Markets are the sub-markets in which cash-access providers compete, or should compete, to provide one-off cash-access transactions to casino patrons. The patron market is separate from the casino market because patrons separately choose whether to use cash-access systems, and by contract they are direct customers of the cash-access provider, which provides cash access to them directly rather than through the casino.

156.    Providers offer casino patrons prompt access to cash from multiple sources in exchange for fees and other charges. Cash-access for casino patrons is a distinct product market because cash continues to be the principal means of exchange in casinos for which demand is inelastic, and traditional alternative cash providers, like banks, are not directly accessible within casinos by virtue of regulatory, commercial, and casino restrictions, and because patrons who are actively engaged in gaming are reluctant to leave the casino to obtain cash based on small but substantial increases in price or corresponding decreases in quality. The fact that gaming cash-access occupies a different market than generic cash-access is evident from the higher charges on casino cash-access transactions and the variety of funding sources casino-cash-access taps in comparison to generic cash-access.

157.    This product market exists within many separate geographic gambling submarkets, rather than nationally, because patrons physically obtain cash at the casino. So while they may conceivably obtain substitute cash-access at other casinos that utilize other cash-access providers, patrons' gaming and, accordingly, their use of casino cash-access, is generally restricted to a single, localized gambling market. Put another way, if a single casino cash-access provider obtained exclusive rights to provide cash-access in the casinos within a given localized

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

24

gambling area, patrons in that area would have no geographically reasonable substitute for obtaining cash while gaming.

158.    The Local Patron Cash-Access Markets comprise as submarkets at least the top twenty gambling markets as defined by the American Gaming Association—Las Vegas Strip, Atlantic City, Chicagoland, Baltimore/Washington DC, Gulf Coast, Queens/Yonkers, Philadelphia, Detroit, St. Louis, Boulder Strip, the Poconos, Black Hawk/Central City, Reno/Sparks, Lake Charles, Memphis, Kansas City, Downtown Las Vegas, Cleveland, Boston, and Miami—as well as many smaller submarkets.

### *The Relevant Digital-Wallet Markets*

159.    Using its market power in the Cash-Access Tying Markets to enforce a contractual tie, Everi is restraining competition in two Digital-Wallet Markets and thereby harming Koin.

160.    The U.S. Casino Digital-Wallet Market is one relevant market, in which providers of gaming digital wallets—as distinct from general-purpose digital-wallet providers like ApplePay or PayPal that regulations bar from direct use in casinos—compete, or should compete, to contract with casinos in the United States to provide digital wallets.

161.    Specifically, in exchange for the opportunity to obtain service charges and other fees from casino patrons who use the provider's digital wallet, providers supply a digital wallet that aids in casino management and reduces casino administrative costs, nets casinos a share of service charges and other fees, and ensures a steady flow of funds to casino patrons who spend the funds at the casino, as described above.

162.    Digital wallets for casinos are a distinct product market because of the unique benefits digital wallets provide to casinos—from tracking and tracing patron spending to preventing overuse and illicit use of funds to reducing overhead and administrative costs associated with hard currency—and are uniquely demanded by certain patrons who prefer not to carry and use cash in the casino environment and in traveling to and from the casino, all of which means that other payment options are not reasonable substitutes. Casinos would not stop contracting with digital-wallet providers even in the face of small but substantial price increases or corresponding decreases in the product quality.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

163.   It is a nationwide market because casinos can look to various U.S.-based casino digital-wallet providers to meet their needs, while foreign providers face substantial barriers to entry to the market due to regulatory restrictions that govern financial transactions at casinos.

164.   Interdependent with the U.S. Casino Digital-Wallet Market is another set of relevant markets: the Local Patron Digital-Wallet Markets. There, digital-wallet providers compete, or should compete, to provide gaming digital wallets to casino patrons. The patron market is separate from the casino market because patrons separately choose whether to use digital wallets, and by contract they are direct customers of the digital-wallet provider, which provides the digital wallet to them directly rather than through the casino.

165.   Providers offer casino patrons prompt access to funds from multiple sources—with all the ease and efficiency of a digital wallet described above—in exchange for fees and other charges. Digital wallets for casino patrons constitute a distinct product market because the demand for digital wallets is separate from and not substitutable by cash for patrons who have shifted to cashless lifestyles or who require the safeguards and gaming limits that digital wallets provide, nor are generic digital wallets a reasonable substitute since they are not useable in casinos by virtue of regulatory, commercial, and casino restrictions. As a result, casino patrons who use digital wallets are not likely to switch to another form of payment in response to a small but substantial increase in price or a corresponding decrease in the quality of the digital-wallet product.

166.   This product market exists within many separate geographic gambling submarkets, rather than nationally, because patrons are relegated to using the digital wallet that is accepted at the casino where the patron is physically gambling. A patron dissatisfied with the digital wallet accepted at one casino could, conceivably, go to another casino that accepts a different digital wallet the patron prefers, but the patron cannot reasonably obtain and use digital wallets that are not marketed and accepted in the localized gambling area where the patron is located. Put another way, if a single digital-wallet provider obtained exclusive rights to provide digital wallets in all casinos within a given localized gambling area, patrons in that area would have no geographically reasonable digital-wallet substitute for use at a casino.

26

167.   The Local Patron Digital-Wallet Markets comprise as submarkets at least the top twenty gambling markets as defined by the American Gaming Association—Las Vegas Strip, Atlantic City, Chicagoland, Baltimore/Washington DC, Gulf Coast, Queens/Yonkers, Philadelphia, Detroit, St. Louis, Boulder Strip, the Poconos, Black Hawk/Central City, Reno/Sparks, Lake Charles, Memphis, Kansas City, Downtown Las Vegas, Cleveland, Boston, and Miami—as well as many smaller submarkets.

### *The Everi-Casino Digital-Wallet Aftermarket*

168.   Finally, as an alternative to the Local Patron Digital-Wallet Markets, there is a relevant aftermarket: the aftermarket for digital wallets at casinos under contract with Everi (the "Everi-Casino Digital-Wallet Aftermarket" or "Digital-Wallet Aftermarket").

169.   The Digital-Wallet Aftermarket arises by virtue of Everi's exclusive contracts with casinos and casinos' unique relationships with their patrons. Casinos like Baldini's and Eureka generate tremendous loyalty from their patrons based on their particular ambiance, their staffs' relationship with patrons, and especially their extensive, strategic loyalty programs that carefully bond patrons to the casinos through discounts, perks, and other incentives. In view of these considerations, it is highly advantageous for a patron to stick with the same casino or casino family.

170.   Patrons of casinos that have contracted exclusively with Everi ("Everi Casinos") are therefore locked into those casinos. Once locked in, they become locked into Everi's cash-access and digital-wallet offerings, too, by virtue of the casinos' long-term exclusive tying arrangement.

171.   Those locked-in patrons lack the information or the incentive necessary to impose competitive discipline on Everi and its digital-wallet product.

172.   When forming a durable bond with an Everi Casino, patrons are not advised of Everi's exclusive digital-wallet arrangement, or the terms that Everi will impose on them, so they cannot account for the costs and quality of the casino's exclusive digital-wallet arrangement with Everi. Indeed, some are locked into Everi Casinos even before the launch of the CashClub Wallet

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

at those casinos, so the exclusive digital-wallet arrangement is completely unaccountable when patrons choose an Everi Casino.

173.    For those who *are* aware of the CashClub Wallet, Everi's terms and condition provide the misleading statements that Everi charges "no fees to deposit . . . or to take your money out of [a] CashClub Wallet" while omitting any disclosures about other fees and costs that *do* apply. In other words, patrons reasonably cannot account for the additional costs and inferior quality of that product vis-à-vis competing digital wallets. And once they are locked in and experience the real costs of Everi's product, those costs are outweighed by the costs of switching to a different casino.

174.    Overall, because a patron's relationship to a particular casino or family of casinos is very sticky and does not come with adequate information about the costs and quality of the casino's digital-wallet offerings, patrons are unlikely to choose or change casinos based on small but significant changes in the price or quality of the casino's funding systems. As a result, when Everi conditions access to its cash-access system on an Everi Casino's agreement to an exclusive five-year digital-wallet contract—with automatic renewals, rights of first refusal, and onerous forfeiture provisions—Everi locks in all of the loyal customers of that casino, too. A locked-in patron who wants to gamble with a digital wallet *must* use Everi's digital-wallet product.

175.    In short, through exclusive dealing and tying, Everi has blocked competition and enjoys a perfect monopoly in the Everi-Casino Digital-Wallet Aftermarket, and it is thereby insulated from competitive pressures on its digital-wallet products because patrons are locked into their preferred casino, with inadequate information to motivate a switch. Everi can and does charge higher prices than its competitors and compromise on the quality of its digital wallet, or otherwise restrict output, because patrons are stuck.

176.    Like any aftermarket, the Everi-Casino Aftermarket exists within the geographical boundaries of the defendant's share of a relevant foremarket. Here, the relevant foremarket is U.S. land-based casinos, and Everi Casinos are Everi's share of that foremarket which circumscribe the scope of the relevant aftermarket.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

28

177.   Because the relevant market should be determined by demand-side realities, and because locked-in Everi-Casino patrons have no reasonable substitute for the CashClub Wallet, from their perspective, a relevant market is the Everi-Casino Digital-Wallet Aftermarket.

**B.     Anticompetitive Conduct**

178.   Everi has used its standard-form Everi Contracts in two ways to impose anticompetitive restraints in the U.S. Casino Digital-Wallet Market, the Local Patron Digital-Wallet Markets, and the Everi-Casino Digital-Wallet Aftermarket (altogether, the "Digital-Wallet Markets and Aftermarket") and has thereby substantially foreclosed competition in, and monopolized or nearly monopolized, those markets.

*Tying*

179.   First, the Everi Contracts impose a tying arrangement to coerce Everi's cash-access casino customers to use only Everi's CashClub Wallet.

180.   As noted above, cash-access systems and digital-wallet products for casinos exist in separate markets, since the demand for them is not cross-elastic and, to their consumers, they are not reasonably interchangeable.

181.   As described more fully below, Everi enjoys market power in the Cash-Access Tying Markets.

182.   With that market power, in addition to restricting output, extracting supracompetitive profits, and sustaining sub-competitive products in the Cash-Access Tying Markets, Everi can and does condition access to its cash-access system on casinos' agreement to use Everi's—and only Everi's—digital wallet.

183.   This tie has a substantial effect on commerce in the Digital-Wallet Markets and Aftermarket and restrains competition.

184.   At the casino level, since Everi enjoys a dominant market share and entrenched market power in the U.S. Casino Cash-Access Market, by tying its digital wallet to its cash-access systems, Everi ports its dominance from that market to the U.S. Casino Digital-Wallet Market and it can—and does—block competitors in that market from providing their digital wallets at

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

the casinos Everi serves. This in turn reduces or eliminates casinos' options for better terms and better digital-wallet products from Everi's competitors.

185.    There is a direct, substantial knock-on effect in the Local Patron Digital-Wallet Markets. Because Everi coerces the dominant majority of casino operators in those submarkets—encompassing the vast majority of cash-access transactions—to offer only Everi's digital wallet by making that a condition to using Everi's cash-access system, patrons have reduced options and are subject to higher fees and charges for Everi's inferior digital wallet than if Everi's market power in the U.S. Casino Cash-Access Market were not ported to the U.S. Casino Digital-Wallet Market through coercive tying.

186.    And, of course, commerce has been affected and competition has been restrained utterly in the Everi-Casino Digital-Wallet Aftermarket. There, locked-in Everi-Casino patrons have no choice whatsoever about the digital wallet they will use. With its market power in the U.S. Casino Cash-Access Market, Everi has tied its digital wallet to its cash-access systems and forced all patrons at Everi Casinos to use the CashClub Wallet if they want to use a digital wallet at all. No digital-wallet commerce other than Everi's occurs in that aftermarket, and no competition can challenge Everi's tied-in market power.

*Exclusive Dealing*

187.    In addition to forcing a tie between its cash-access systems and its digital wallet, Everi has restrained trade in the Digital-Wallet Markets and Aftermarket by imposing onerous, long-term exclusive contracts on casinos and, by extension, on their patrons.

188.    The standard-form Everi Contracts create an initial five-year exclusivity period during which the contracting casinos may not work with any other provider of digital wallets or comparable non-cash funding sources. Since these initial five-year periods lapse at various times, any competitor wishing to make a pitch would have to sustain a five-year marketing campaign just to get a single opportunity with each casino.

189.    Not only are Everi Casinos locked in for the initial five years, but they can opt out of automatic three-year renewal periods only by following precise and exacting notice protocols and, even then, only if Everi agrees. That is because, in addition to its long-term auto-renewing

30

exclusive rights, Everi enjoys the right of first refusal to match any competitor who might come along with an alternative when one of Everi's exclusive contracts is eligible for pre-renewal opt-out.

190.   For the rogue Everi Casino that might wish to breach its exclusive contract with Everi, the forfeiture penalties impose a cost that makes early termination untenable. The casino would have to return any bonuses paid by Everi—which reach into the hundreds of thousands and, for casinos large enough, millions of dollars—even though those bonuses are largely intended for and used by casinos to buy required hardware from Everi that is meant only for use with Everi's products and services. And that hardware remains the responsibility of terminating casinos; they cannot return it to Everi.

191.   By virtue of these airtight exclusive arrangements, Everi has substantially foreclosed competition in the U.S. Casino Digital-Wallet Market and has tended to create a monopoly for itself therein.

192.   Naturally, Everi's long-term exclusive contracts with casinos also affect patrons in the Local Patron Digital-Wallet Markets and the Digital-Wallet Aftermarket.

193.   Everi's exclusive contracts are so widespread among casinos in the U.S. Casino Digital-Wallet Market that patrons have few, if any, other options for digital wallets within the Local Patron Digital-Wallet Markets or the Digital-Wallet Aftermarket. As a result, Everi's exclusive dealing has substantially foreclosed competition and tended to create monopolies for Everi within those markets.

### _Monopolization and Attempted Monopolization_

194.   By tying its digital wallet to its dominant cash-access systems and imposing onerous exclusive contracts on Everi Casinos, Everi has obtained monopoly power in the Everi-Casino Digital Wallet Aftermarket.

195.   Using those means in the broader Digital-Wallet Markets, Everi has restrained trade and achieved dominant market power; indeed, there is a dangerous probability that Everi

will achieve monopoly power in the full Digital-Wallet Markets, if it has not done so already, and Everi's monopoly power is assured in light of its forthcoming merger with IGT.

196.   Everi has obtained widespread market power through its tying scheme, and it has locked in that power through exclusive dealing. That was its express plan—to leverage its cash-access business and relationships to lock in a dominant share of digital-wallet business.

197.   Everi's dominance in the Digital-Wallet Markets, new as those markets are, is already entrenched. As noted above, the staggered nature of its long-term exclusive contracts imposes tremendous startup costs on any would-be competitor in the Digital-Wallet Markets, who must ride out the initial five years of Everi contracts just to get a single crack at each casino in the U.S. Casino Digital-Wallet Markets and, by extension, those casinos' patrons in the Local Patron Digital-Wallet Markets and the Digital-Wallet Aftermarket.

198.   In addition to this barrier to entry, would-be competitors must pass muster with stringent regulators who put those who would like to become new entrants in the gaming industry through rigorous paces before the entrants pass muster and are permitted to attempt to enter the market.

199.   Moreover, competitors must maintain financing not only to keep their businesses afloat while waiting to mount a charge at Everi when its exclusive contract terms lapse; they must obtain financing to back the financial transactions their products facilitate in the Digital-Wallet Markets and Aftermarket.

200.   And, of course, while battling to breach the wall of Everi's exclusive contracts, competitors must continually refine and improve their digital-wallet products to ensure ongoing regulatory compliance and appeal to consumers who have come to expect seamless, glitch-free, and frictionless digital transactions in other facets of their lives outside gaming.

201.   These barriers to entry protect Everi's monopoly, or near-monopoly, power in the Digital-Wallet Markets and Aftermarket.

202.   In the broader Digital-Wallet Markets, Everi's market power will substantially increase once the Everi-IGT merger is consummated, as Everi will then be able to preclude its digital-wallet competitors from partnering with any casino utilizing IGT's CMS services. Adding

those many casino operators to those already locked up by Everi's exclusive tying agreements will entrench Everi as a monopolist in the Digital-Wallet Markets.

*No Business Justifications*

203.    As a general matter, there are hardly any procompetitive reasons to engage in coercive tying, and none exists here.

204.    The logistics of providing casinos and patrons with cash-access systems and digital wallets are so unrelated that there are insufficient synergies to outweigh the anticompetitive effects of a forced tie. Casinos and patrons, which would prefer the option to obtain cash-access and digital wallets from different vendors, do not benefit from Everi's tying arrangement.

205.    Nor can Everi show a procompetitive justification for its long-term, ironclad exclusive contracts. For its digital-wallet customers—casinos and patrons—the relevant marginal costs are far lower than for cash-access systems, and per the Everi Contracts, the costs for required casino-located hardware are borne by casinos, not by Everi. Moreover, per the Everi Contracts, casinos must pay back any incentives Everi pays to them as part of contracting for digital wallets. Everi does not have sufficient costs to justify its indefinite exclusive contracts with casinos, or even the initial five years of exclusivity.

206.    In short, Everi's conduct does not help casinos or patrons; it does not help Everi compete more effectively and thereby improve the Digital-Wallet Markets; it simply restrains competition and enhances Everi's monopoly power.

**C.    Market Power**

207.    Through its anticompetitive conduct, Everi has restrained competition and taken over the Digital-Wallet Markets and Aftermarket.

208.    Within the Cash-Access Tying Markets, Everi has long enjoyed extensive market power. Not only has Everi taken a dominant share of those markets—75% to 90% according to informed estimates—but it also acts in a manner that reflects broad and entrenched market power. For example, Everi can impose onerous terms on the casinos with which it contracts. It requires casinos to sign long-term exclusive contracts with automatic renewals that may be disclaimed

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

33

only with precise timing. And when a casino customer seeks to end its relationship with Everi, Everi enjoys a right of first refusal with a 30-day review period. Moreover, if a casino seeks to terminate the long-term arrangement, Everi enjoys the right to impose penalty or forfeiture provisions on the casino. Everi enjoys complete exclusivity over cash-access systems and any other similar services and products, which, according to Everi, includes digital wallets. Everi can increase its fees and charges unilaterally, and should a casino expand its footprint through construction or acquisition, Everi enjoys exclusive rights at those locations, and the casino customer is obliged to drop any competing provider at those locations.

209.    In a competitive market, Everi could not impose these draconian terms. But thanks to its market power, Everi can and does impose those terms, and, in doing so, Everi has cleaned up.

210.    As shown in the excerpt from its annual report above, in 2022, Everi raked in more than $206 million in revenues from financial access services on just $10 million in costs—an astounding 95% margin from that business line.

211.    That financial coup is directly funded by cash-access patrons in casinos, who are Everi's direct customers—not the casinos' customers—pursuant to the casinos' contracts with Everi. Everi's dominant market share in the U.S. Casino Cash-Access Market carries over to the Local Patron Cash-Access Markets, where Everi likewise enjoys dominant market power. In each of the metro-area submarkets Everi uses its power to extract supracompetitive prices from casino patrons. For example, for low-dollar credit-card cash-access transactions (i.e., $50.00 or less), Everi charges a fee of *at least* 12% for the pleasure of using its kiosks, *on top* of whatever fees the credit card companies impose. A patron accessing $400 or less pays Everi at least 6% on top of their credit card fees. The following summary of minimum fees illustrates Everi's cash-access pricing:

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

34

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

EXHIBIT C
CARDHOLDER FEES

| CARDHOLDER FEE - CREDIT CARD TRANSACTION | |
|---|---|
| Cardholder Requested Dollar Amount | Cardholder Fee |
| $0.01 - 50.00 | $5.99 |
| $50.01 - 100.00 | $8.99 |
| $100.01 - 200.00 | $14.99 |
| $200.01 - 300.00 | $18.99 |
| $300.01 - 400.00 | $23.99 |
| $400.01 - 500.00 | $27.99 |
| $500.01 - 600.00 | $33.99 |
| $600.01 - 700.00 | $37.99 |
| $700.01 - 800.00 | $41.99 |
| $800.01 - 900.00 | $45.99 |
| $900.01 - 1,000.00 | $49.99 |
| $1,000.01 - 1,500.00 | $64.99 |
| $1,500.01 - 2,000.00 | $80.99 |
| $2,000.01 - 2,500.00 | $98.99 |
| $2,500.01 - 5,000.00 | $109.99 |
| $5,000.01 - and above | 3.0% of Cardholder Requested Dollar Amount |

212.     And Everi extracts these supracompetitive profits from patrons who would rather not be stuck with Everi's cash-access systems. The Better Business Bureau has received and published dozens of consumer complaints in which Everi has failed to provide the requested cash to casino patrons even while debiting the patrons' accounts for the failed withdrawal *plus* fees and has subjected patrons to high and unclear fees and other charges:

**Initial Complaint**
04/10/2023

On 4/5/2023 while being a guest at *********** casino in Coachella at 8:17pm I went to a kiosk to withdrawal more funds. I walk up to the atm kiosk owned by everi and select purchase gaming ticket which would no longer be considered a withdrawal not it would be considered a POS (Point Of Sale) purchase for the dollar amount ****** USD after fees total came up to ****** USD so I proceed with the purchase but as Im standing there waiting I receive a message that transaction could not be processed and simply removed my card from the slot. I check my bank account info and it shows me that I was charged for that transaction, Igo to speak to casino employee and he states if you never received anything than it will be readmitted to ur account so following morning I wake up and my account still hadnt been returned so I proceed I immediately filing a dispute. During the deposition Of the dispute I reached out to Everi and they told me the funds had been returned to my account and it would reflect on my statement

once my bank reimbursed my funds and that they dont know why my bank hadnt posted the funds yet, un sense launching all fault on my bank. I call my bank same day and notify them what everi stated for the record and that if that was the case my funds wouldve already been transferred to my account but now I come on this site and see a lot of similar complaint. This is absurd and needs to stop immediately. So following day I escalate my dispute to a claim and to my surprise 4/9/2023 it was denied by my bank. So either Everi Are legal thieves and dishonest business men and Blatant liars or some really needs to see to go see whats going on with are funds. I would like to be paid In full out of court not a cent more but if legal action is need you guys will being all legal proceeding and restitution. Paid in full I wont settle for less . Do not use Everi kiosk if avoidable not bashing there company just dont want the consumers of ******* deal with this and inflation

👤 **Initial Complaint**
09/10/2021

I withdrew $100 from a Las Vegas ATM in a casino in addition to the $8.99 fee that was disclosed for the withdrawal; should be straight forward right? No. Then I was charged again separately for $2.50 later that day for no reason at all. There was no other fee disclosed besides the $8.99 for the withdrawal. It's not a lot of money, but I want a refund for the $2.50 because it's just simply not right, and I am worried that Everi will be able to deceivingly charge my card in small amounts like this in the future without me catching it. I need to be 100% confident and certain that no further "secret" charges will be made to my card. If I already paid for the withdrawal fee with my withdrawal.... why would the Everi charge me $2.50 separately when I never stepped near a machine after that? It just reeks of scam-like characteristics and deceit.

213.   Patrons do not want to use Everi for cash access, but patrons have few if any alternatives and must accept supracompetitive fees for sub-competitive products and services.

214.   Thus, in each of Local Patron Cash-Access Markets, Everi enjoys market power over cash access for casino patrons.

215.   By leveraging its market power in the Cash-Access Tying Markets, Everi has imposed long-term exclusive adhesion contracts with casinos and forced them to accept exclusively Everi's CashClub Wallet if they want Everi's cash-access systems.

216.   In this way, Everi has affected a substantial amount of interstate commerce and substantially foreclosed competition in the U.S. Casino Digital-Wallet Market and in each of the submarkets that comprise the Local Patron Digital-Wallet Markets.

217.   Indeed, discovery likely will show that, through its form contracts, Everi has obtained control over comparable market share in the Digital-Wallet Markets as it enjoys in the parallel Cash-Access Tying Markets.

218.    Moreover, Everi has stated its intent to leverage its existing dominance of the Cash-Access Tying Markets to take over the Digital-Wallet Markets, and there is a dangerous probability it will succeed—an outcome that is assured by its forthcoming merger with IGT.

219.    Everi's near-monopoly power in the Digital-Wallet Markets clearly is not a function of skill, foresight, and industry, but of naked restraints on trade in the form of tying and exclusive dealing.

220.    Reflecting its near-monopoly power in the Digital-Wallet Markets, Everi can and does impose supracompetitive financial terms even though its CashClub Wallet cannot support the same quality and breadth of financial transactions that would exist in a competitive market.

221.    When a patron uses the CashClub Wallet at a slot machine or a gaming table, Everi generally charges the casino approximately 50 basis points *plus* a fixed transaction fee, usually around $0.50, without losing business, whereas in a competitive digital-wallet market, Everi would have to compete with pricing at or below 40 basis points, without an additional transaction fee, since these are the terms competitors have offered and would offer if Everi were not restraining competition.

222.    Patrons also pay more as a result of Everi's anticompetitive conduct, and Everi takes pains to hide this fact. Although Everi tells patrons "[t]here is no fee for enrolling in a Wallet account or maintaining a Wallet account" and that "[t]here are no fees to deposit cash or tickets . . . or to take your money out of your" CashClub Wallet, Everi does not disclose that its users pay other, higher fees for loading funds than they would in a competitive market. First, patrons are subject to third-party fees when loading funds from a credit card, debit card, bank account, or ACH transfer, and third-party financial institutions charge higher fees to fund gaming-only wallets like Everi's than they charge to fund general-purpose wallets, which Everi's anticompetitive conduct blocks from the marketplace. Second, while any third-party fees would simply be passed on to patrons in a competitive market—as Everi's competitors have offered and would offer if they were permitted to compete—Everi generally can and does charge a mark-up on top of the third-party fees.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

37

223.    Worse still, Everi has enforced its tying and exclusivity rights even where Everi has not yet launched its own CashClub Wallet. In other words, Everi has successfully excluded competitors from the Digital-Wallet Markets even without offering a competing product at *any* price.

224.    Everi's market power in the Digital-Wallet Markets is evident because, over time, it has successfully imposed higher fees for a less robust product (where it has any product at all), and has restricted output more, than it could in competitive Digital-Wallet Markets.

225.    And once it consummates its pending merger with IGT, using its existing anticompetitive tactics, Everi will be able to leverage IGT's CMS networks to control upwards of 75% of the Digital-Wallet Markets without any meaningful competition over price or product quality. Everi is dangerously close to achieving monopoly power in the Digital-Wallet Markets, if it has not done so already.

226.    In terms of the alternative Everi-Casino Digital-Wallets Aftermarket, Everi enjoys perfect monopolies and faces no meaningful competition for patrons' in-casino business where it has imposed long-term exclusivity rights on casinos, with rights of first refusal and punishing forfeiture provisions, that tie digital wallets to cash-access systems. For these locked-in patrons, Everi is free to price its products and services without fear of competitive pressure.

**D.    Antitrust Injury and Standing**

227.    Everi has harmed competition in the Digital-Wallet Markets and Aftermarket and, in doing so, has harmed casinos and their patrons, as well as Koin.

*Injury to Competition*

228.    As explained above, casinos and patrons pay more for a less robust digital-wallet product as a result of Everi's anticompetitive conduct.

229.    In a competitive marketplace, casinos and patrons would have more options for better, more innovative digital-wallet products with more favorable financial terms.

230.    At the very least, a competitive market would ensure casinos and patrons have *some* option for providing digital wallets, whereas, in the present Digital-Wallet Markets and Aftermarket over which Everi has obtained near-monopoly power (if not outright monopoly

38

power), Everi bars its casino partners—and by extension their patrons—from using other providers' digital wallets even when Everi has not yet made its CashClub Wallet available.

231.    As a result of Everi's exclusion of competitive alternatives, like Koin and Pavilion, casinos and patrons in the Digital-Wallet Markets and Aftermarket have few, if any, reasonable alternatives to Everi's over-priced, under-developed product, if it's offered at all.

232.    Uncompetitive terms, higher prices, unhappy customers, unsatisfactory or entirely unavailable digital-wallet products, and an overall lack of choice: these reflect the antitrust injury—the harm to competition—that casinos and patrons bear as a result of Everi's exclusionary conduct.

*Injury in Fact to Koin*

233.    Everi's conduct, of course, harms Koin, too.

234.    Koin stands ready to compete for the business of casinos and patrons with a feature-rich digital wallet with competitive terms of use.

235.    But through tying and exclusive dealing, Everi has locked up the U.S. Casino Digital-Wallet Market, the Local Patron Digital-Wallet Markets, and the Everi-Casino Digital-Wallet Aftermarket and thereby restrained Koin and other digital-wallet providers from competing to win casino contracts and patron transactions in those markets.

236.    For example, Everi has used its exclusive contracts, which tie cash-access and digital wallets, to interfere with Koin's relationships with casinos like Baldini's and Eureka to offer the Koin Wallet to their patrons, even though those casinos would prefer to do business with a digital-wallet vendor other than Everi.

237.    Everi also has used its anticompetitive scheme to prevent Koin from competing for new contracts in the burgeoning Digital-Wallet Markets.

238.    Everi's conduct has cost Koin tens of millions of dollars in lost profits and has caused Koin to waste millions of dollars on research, development, and marketing that Everi's anticompetitive conduct has rendered worthless.

239.    Given its unique position as the direct target of Everi's anticompetitive scheme, Koin stands in the best position to vindicate the interests of fair and robust competition for the benefit of casinos, patrons, and digital-wallet providers.

240.    Casinos need Everi's cash-access systems and therefore have conflicting interests that dull their desire and ability to enforce the antitrust laws against Everi.

241.    Patrons are too diffuse, and often unaware, of the competitive injury they are suffering by virtue of Everi's conduct.

242.    Among its competitors, Koin stands in a unique position where its opportunity to win market share is not merely hindered by Everi's anticompetitive conduct; Everi has blocked or attempted to block existing Koin contracts in multiple locations and has sought to block Koin from competing nationwide.

243.    Koin is in the best position to vindicate the objectives of antitrust law and ensure competition thrives in the nascent Digital-Wallet Markets and Aftermarket.

**FIRST CLAIM FOR RELIEF**
**Sherman Act Section 1, 15 U.S.C. § 1 | Clayton Act Section 3, 15 U.S.C. § 14**
***Per Se* Unlawful Restraint of Trade – Tying**

244.    Koin hereby incorporates each of the allegations in the foregoing paragraphs as if fully set forth herein.

245.    Federal law prohibits agreements in restraint of trade, deeming some agreements *per se* unreasonable and unlawful, including those in which a company with market power in one market ties its goods or services in that market to affect a substantial amount of trade and restrain competition in the market for the tied goods or services.

246.    Everi has entered into *per se* unreasonable and unlawful tying agreements, which condition casinos' use Everi's cash-access system (the tying product) on their exclusive use of Everi's CashClub Wallet (the tied product) for a minimum five-year term with no competitive justification.

247.    Everi enjoys entrenched market power in the Cash-Access Tying Markets—both in the national casino market and in the interdependent local patron markets—and Everi uses

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

that market power to coerce casinos into these tying agreements, which are part of its standard-form cash-access contracts.

248.    By doing so, Everi has substantially affected commerce in the separate Digital-Wallet Markets and Aftermarket. According to Everi, all casinos who utilize its cash-access systems also are locked into utilizing its digital wallet. Those casinos and patrons cannot get out, and other digital-wallet providers can't get in.

249.    This naturally harms competition. Everi's tying arrangement deprives casinos and their patrons of the choice to obtain cash access and digital wallets from different providers, which many casinos wish to do. This, in turn, has stifled competition in the nascent market for digital wallets. Everi need not innovate new technology nor compete on pricing terms or product quality in order to win business in the Digital-Wallet Markets and Aftermarket. Instead, Everi has seized that business through its tying arrangement.

250.    Under this arrangement, casinos and patrons get a sub-competitive digital wallet with supracompetitive financial terms and no choice in the matter due to restricted output.

251.    Everi, on the other hand, wins coming and going. It can and does stifle competition by which the dynamic Digital-Wallet Markets and Aftermarket would more quickly render the Cash-Access Tying Markets obsolete, so Everi extends the shelf-life and profitability of the Cash-Access Tying Markets it controls. Yet as gambling inexorably shifts to digital wallets, Everi has lessened competition through tying and obtained market power in the Digital-Wallet Markets and Aftermarket, all of which has tended to create a monopoly for itself therein.

252.    Furthermore, as a direct result of Everi's anticompetitive conduct, Koin has suffered injury in fact. Everi's anticompetitive conduct has harmed Koin by depriving it of profits that it otherwise would have realized from casinos and from patrons in the U.S. Casino Digital-Wallet Market, the Local Patron Digital-Wallet Markets, and the Everi-Casino Digital-Wallet Aftermarket, both through its partnerships with Baldini's and Eureka and through the other business opportunities that Koin was and would be winning but for Everi's anticompetitive conduct. As alleged above, Koin has suffered and will suffer tens of millions of dollars of

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

41

damages as a result of Everi's anticompetitive conduct, including damages from lost profits, lost business opportunities, wasted investments, and reputational and operational harm.

253.    The injuries and losses suffered by Koin constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from Everi's anticompetitive conduct described above, including Everi's anticompetitive tying agreements, and Koin is optimally situated to force Everi's compliance with antitrust law.

**SECOND CLAIM FOR RELIEF**
**Sherman Act Section 1, 15 U.S.C. § 1 | Clayton Act Section 3, 15 U.S.C. § 14**
**Unreasonable Restraint of Trade – Tying (In the Alternative to First Claim for Relief)**

254.    Koin hereby incorporates each of the allegations in the foregoing paragraphs as if fully set forth herein.

255.    Federal law also prohibits tying agreements that result in an unreasonable restraint of trade under a "rule of reason."

256.    Everi has entered into unreasonable and unlawful tying agreements, which condition casinos' use of Everi's cash-access system (the tying product) on their exclusive use of Everi's CashClub Wallet (the tied product) for a minimum five-year term with no competitive justification.

257.    Everi enjoys entrenched market power in the Cash-Access Tying Markets—both in the national casino market and in the interdependent local patron markets—and Everi uses that market power to coerce casinos into these tying agreements, which are part of its standard-form cash-access contracts.

258.    By doing so, Everi has substantially affected commerce in the Digital-Wallet Markets and Aftermarket. According to Everi, all casinos who utilize its cash-access systems also are locked into utilizing its digital wallet. Those casinos and patrons cannot get out, and other digital-wallet providers can't get in.

259.    This naturally harms competition. Everi's tying arrangement deprives casinos and their patrons of the choice to obtain cash access and digital wallets from different providers, which many casinos wish to do. This, in turn, has stifled competition in the nascent market for digital wallets. Everi need not innovate new technology nor compete on pricing terms or product

quality in order to win business in the Digital-Wallet Markets and Aftermarket. Instead, Everi has seized that business through its tying arrangement.

260. Under this arrangement, casinos and patrons get a sub-competitive digital wallet with supracompetitive financial terms and no choice in the matter due to restricted output.

261. Everi, on the other hand, wins coming and going. It can and does stifle competition by which the dynamic Digital-Wallet Markets and Aftermarket would more quickly render the Cash-Access Tying Markets obsolete, so Everi extends the shelf-life and profitability of the Cash-Access Tying Markets it controls. Yet as gambling inexorably shifts to digital wallets, Everi has lessened competition through tying and obtained market power in the Digital-Wallet Markets and Aftermarket, all of which has tended to create a monopoly for itself therein.

262. Furthermore, as a direct result of Everi's anticompetitive conduct, Koin has suffered injury in fact. Everi's anticompetitive conduct has harmed Koin by depriving it of profits that it otherwise would have realized from casinos and from patrons in the U.S. Casino Digital-Wallet Market, the Local Patron Digital-Wallet Markets, and the Everi-Casino Digital-Wallet Aftermarket, both through its partnerships with Baldini's and Eureka and through the other business opportunities that Koin was and would be winning but for Everi's anticompetitive conduct. As alleged above, Koin has suffered and will suffer tens of millions of dollars of damages as a result of Everi's anticompetitive conduct, including damages from lost profits, lost business opportunities, wasted investments, and reputational and operational harm.

263. The injuries and losses suffered by Koin constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from Everi's anticompetitive conduct described above, including Everi's anticompetitive tying agreements, and Koin is optimally situated to force Everi's compliance with antitrust law.

**THIRD CLAIM FOR RELIEF**
**Sherman Act Section 1, 15 U.S.C. § 1 | Clayton Act Section 3, 15 U.S.C. § 14**
**Unreasonable Restraint of Trade – Exclusive Dealing**

264. Koin hereby incorporates each of the allegations in the foregoing paragraphs as if fully set forth herein.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

265.    Federal law prohibits exclusive agreements that result in an unreasonable restraint of trade under a "rule of reason."

266.    Everi has entered into unreasonable and unlawful exclusive dealing agreements that require contracting casinos to exclusively offer Everi's digital wallet, CashClub Wallet, to their patrons and that impose at least five-year terms with rights of first refusal and onerous forfeiture clauses—including claw-back of bonus payments and unreturnable Everi-exclusive equipment. Everi imposes such exclusivity on casinos, without competitive justification, in violation of the Clayton Act and the Sherman Act.

267.    Everi's exclusive dealing agreements cannot be circumvented, are of long duration, and are not easily terminable as a matter of practical economics. Everi thereby coerces casinos and patrons into using its CashClub Wallet to the exclusion of Everi's competitors, like Koin, and precludes contracting casinos and their patrons from utilizing digital-wallet products they would otherwise choose in a competitive environment.

268.    In this way, Everi has substantially foreclosed competition in the Digital-Wallet Markets and Aftermarket and has obtained market power therein.

269.    Everi's anticompetitive conduct has restrained competition and harmed its customers—both casinos and patrons in the Digital-Wallet Markets and Aftermarket—by precluding them from obtaining alternative digital wallets with better financial terms and better, more innovative features that would exist in a competitive marketplace.

270.    Furthermore, as a direct result of Everi's anticompetitive conduct, Koin has suffered injury in fact. Everi's anticompetitive conduct has harmed Koin by depriving it of profits that it otherwise would have realized from casinos and from patrons—both through its partnerships with Baldini's and Eurekas and through the other business opportunities that Koin was and would be winning but for Everi's anticompetitive conduct. As alleged above, Koin has suffered and will suffer tens of millions of dollars of damages as a result of Everi's anticompetitive conduct, including damages from lost profits, lost business opportunities, and reputational and operational harm.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

44

271.    The injuries and losses suffered by Koin constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from Everi's anticompetitive conduct described above, including Everi's anticompetitive exclusive dealing agreements, and Koin is optimally situated to force Everi's compliance with antitrust law.

**FOURTH CLAIM FOR RELIEF**
**Sherman Act Section 2, 15 U.S.C. § 2**
**Attempted Monopolization**

272.    Koin hereby incorporates each of the allegations in the foregoing paragraphs as if fully set forth herein.

273.    The Sherman Act prohibits the acquisition or maintenance of monopoly power by the use of exclusionary or otherwise anticompetitive conduct that, in turn, harms competition and consumers. Even if Everi has not yet fully monopolized the Digital-Wallet Markets, it has attempted to monopolize those markets and is dangerously close to succeeding, which the Sherman Act also prohibits.

274.    A defendant attempts to monopolize in violation of the Sherman Act by engaging in anticompetitive or exclusionary conduct with the specific intent to monopolize and by achieving a dangerous probability of obtaining monopoly power, resulting in antitrust injury.

275.    Here, Everi has acted with the specific intent to monopolize the market as demonstrated by its express tying strategy to extend its dominance and its efforts to exclude Koin from the Digital-Wallet Markets.

276.    Using its tying and exclusive dealing agreements alleged above and its market power in the Cash-Access Tying Markets, Everi has acquired, enhanced, and maintained market power over the Digital-Wallet Markets. Everi's dominance of the Digital-Wallet Markets, if it has not already reached monopoly levels, is dangerously close to doing so, and Everi stands to assure itself a monopoly in the Digital-Wallet Markets, with upwards of a 75% market share, through its existing anticompetitive conduct and the pending Everi-IGT merger.

277.    Reflecting its near-monopoly market power in the Local-Patron Digital-Wallet Markets, Everi has the ability to, and does in fact, profitably charge supracompetitive fees for

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

transactions conducted through its digital wallet, Everi CashClub Wallet, by the patrons of casinos that have agreed to Everi's tying agreements. Everi also has the ability to, and does in fact, offer a product inferior to that of other digital-wallet providers, including Koin, without a concomitant loss of demand. In the U.S.-Casino Digital-Wallet Market, Everi's near-monopoly power is reflected by its ability to profitably maintain casino customers even where the casino-management features of the digital wallet are inferior to that which would exist in a competitive environment, and the costs to the casino are higher.

278.   Everi obtained its near-monopoly power and the corresponding ability to impose supracompetitive pricing and to provide a sub-competitive product through anticompetitive and exclusionary conduct, specifically, through anticompetitive tying and exclusive-dealing agreements. Through these anticompetitive agreements and by virtue of the capital-intensive, development-reliant, highly regulated nature of digital wallets, Everi's near-monopolies enjoy durable barriers against the entry of would-be competitors.

279.   Everi's anticompetitive conduct has restrained competition and harmed its customers—both casinos and patrons in the Digital-Wallet Markets—by precluding them from obtaining alternative digital wallets with better financial terms and better, more innovative features that would exist in a competitive marketplace.

280.   Furthermore, as a direct result of Everi's anticompetitive conduct, Koin has suffered injury in fact. Everi's anticompetitive conduct has harmed Koin by depriving it of profits that it otherwise would have realized from casinos and from patrons—both through its partnerships with Baldini's and Eureka and through the other business opportunities that Koin was and would be winning but for Everi's anticompetitive conduct. As alleged above, Koin has suffered and will suffer tens of millions of dollars of damages as a result of Everi's anticompetitive conduct, including damages from lost profits, lost business opportunities, and reputational and operational harm.

281.   The injuries and losses suffered by Koin constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

Everi's anticompetitive conduct described above, including Everi's monopolistic tying and exclusive dealing, and Koin is optimally situated to force Everi's compliance with antitrust law.

### FIFTH CLAIM FOR RELIEF
### Sherman Act Section 2, 15 U.S.C. § 2
### Monopolization (In the Alternative to the Fourth Claim for Relief)

282.    Koin hereby incorporates each of the allegations in the foregoing paragraphs as if fully set forth herein.

283.    The Sherman Act prohibits the acquisition or maintenance of monopoly power by the use of exclusionary or otherwise anticompetitive conduct that, in turn, harms competition and consumers.

284.    Using the tying agreements and exclusive dealing alleged above, Everi has acquired, enhanced, and maintained monopoly power in the Everi-Casino Digital-Wallet Aftermarket, where patrons are locked into Everi Casinos by virtue of brand adhesion, extensive loyalty programs with financial and in-kind incentives, and a general lack of information about the lower fees, innovation, and competitive alternatives they lose when forging a durable bond with an Everi Casino.

285.    Reflecting its monopoly power in the Digital-Wallet Aftermarket, Everi has the ability to, and does in fact, profitably charge supracompetitive fees for transactions conducted through its digital wallet, Everi CashClub Wallet, by the patrons of casinos that have succumbed to Everi's coercive tying agreements. Everi also has the ability to, and does in fact, offer a product inferior to that of other digital wallet providers, including Koin, without a concomitant loss of demand.

286.    Everi obtained its monopoly power and the corresponding ability to impose supracompetitive pricing and to provide a sub-competitive product through anticompetitive and exclusionary conduct, specifically, through anticompetitive tying and exclusive-dealing agreements. Through these anticompetitive agreements and by virtue of the capital-intensive, development-reliant, highly regulated nature of digital wallets, Everi's monopolies enjoy durable barriers against the entry of would-be competitors.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

287.    Everi's anticompetitive conduct has restrained competition and harmed its customers in the Digital-Wallet Aftermarket by precluding them from obtaining alternative digital wallets with better financial terms and better, more innovative features that would exist in a competitive marketplace.

288.    Furthermore, as a direct result of Everi's anticompetitive conduct, Koin has suffered injury in fact. Everi's anticompetitive conduct has harmed Koin by depriving it of profits that it otherwise would have realized from casinos and from patrons—both through its partnerships with Baldini's and Eureka and through the other business opportunities that Koin was and would be winning but for Everi's anticompetitive conduct. As alleged above, Koin has suffered and will suffer tens of millions of dollars of damages as a result of Everi's anticompetitive conduct, including damages from lost profits, lost business opportunities, and reputational and operational harm.

289.    The injuries and losses suffered by Koin constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from Everi's anticompetitive conduct described above, including Everi's monopolistic tying and exclusive dealing, and Koin is optimally situated to force Everi's compliance with antitrust law.

## SIXTH CLAIM FOR RELIEF
### Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.060(1)(d)
### *Per Se* Unlawful Restraint of Trade – Tying

290.    Koin hereby incorporates each of the allegations in the foregoing paragraphs as if fully set forth herein.

291.    Nevada's Unfair Trade Practices Act ("NUTPA") prohibits activities which have been adjudicated *per se* unreasonable restraints of trade under federal antitrust law.

292.    Section 598A.060(1)(d) of NUTPA prohibits tying arrangements "consisting of contracts in which the seller or lessor conditions the sale or lease of commodities or services on the purchase or leasing of another commodity or service."

293.    Based on the same allegations set forth above in relation to its federal-law *per se* tying claim, Everi has entered into *per se* unreasonable and unlawful tying agreements under Nevada law. By conditioning the availability of its cash-access systems—over which it enjoys

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

market power in the Cash-Access Tying Markets—on the exclusive use of its digital wallet, Everi has excluded Koin and other digital-wallet providers from the Digital-Wallet Markets and Aftermarket and thereby affected a substantial amount of trade, restrained competition, and obtained market power in those markets.

294.    Everi's anticompetitive conduct has restrained competition and harmed its customers—both casinos and patrons in the Digital-Wallet Markets and Aftermarket—by precluding them from obtaining alternative digital wallets with better financial terms and better, more innovative features that would exist in a competitive marketplace.

295.    Furthermore, as a direct result of Everi's anticompetitive conduct, Koin has suffered injury in fact. Everi's anticompetitive conduct has harmed Koin by depriving it of profits that it otherwise would have realized from casinos and from patrons—both through its partnerships with Baldini's and Eureka and through the other business opportunities that Koin was and would be winning but for Everi's anticompetitive conduct. As alleged above, Koin has suffered and will suffer tens of millions of dollars of damages as a result of Everi's anticompetitive conduct, including damages from lost profits, lost business opportunities, and reputational and operational harm.

296.    The injuries and losses suffered by Koin constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from Everi's anticompetitive conduct described above, including Everi's anticompetitive tying and exclusive dealing agreements, and Koin is optimally situated to force Everi's compliance with antitrust law.

**SEVENTH CLAIM FOR RELIEF**
**Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.060(1)(d)**
**Unreasonable Restraint of Trade – Tying (In the Alternative to Sixth Claim for Relief)**

297.    Koin hereby incorporates each of the allegations in the foregoing paragraphs as if fully set forth herein.

298.    Section 598A.060(1)(d) of NUTPA prohibits tying arrangements "consisting of contracts in which the seller or lessor conditions the sale or lease of commodities or services on the purchase or leasing of another commodity or service."

49

299.    Based on the same allegations set forth above in relation to Koin's Sherman Act Section 1 claims, Everi has entered into lengthy, exclusive tying agreements that are unreasonable and unlawful under Nevada law. Using its market power in the Cash-Access Tying Markets, Everi has compelled cash-access users to use its digital wallet, too, and thereby excluded Koin and other digital-wallet providers from the Digital-Wallet Markets and Aftermarket and affected a substantial amount of trade, restrained competition, and obtained market power in those markets.

300.    Everi's anticompetitive conduct has restrained competition and harmed its customers—both casinos and patrons in the Digital-Wallet Markets and Aftermarket—by precluding them from obtaining alternative digital wallets with better financial terms and better, more innovative features that would exist in a competitive marketplace.

301.    Furthermore, as a direct result of Everi's anticompetitive conduct, Koin has suffered injury in fact. Everi's anticompetitive conduct has harmed Koin by depriving it of profits that it otherwise would have realized from casinos and from patrons—both through its partnerships with Baldini's and Eureka and through the other business opportunities that Koin was and would be winning but for Everi's anticompetitive conduct. As alleged above, Koin has suffered and will suffer tens of millions of dollars of damages as a result of Everi's anticompetitive conduct, including damages from lost profits, lost business opportunities, and reputational and operational harm.

302.    The injuries and losses suffered by Koin constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from Everi's anticompetitive conduct described above, including Everi's anticompetitive tying agreements, and Koin is optimally situated to force Everi's compliance with antitrust law.

**EIGHTH CLAIM FOR RELIEF**
**Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.060(1)(e)**
**Monopolization and Attempted Monopolization**

303.    Koin hereby incorporates each of the allegations in the foregoing paragraphs as if fully set forth herein.

304.    NUTPA prohibits "monopolization of trade or commerce in this state, including, without limitation, attempting to monopolize or otherwise combining or conspiring to monopolize trade or commerce in this state." This prohibits monopolization and attempted monopolization to the same extent as prohibited under federal antitrust laws.

305.    Based on the same allegations of tying and exclusive dealing set forth above in relation to Koin's federal-law monopolization claims, Everi has acquired, enhanced, and maintained monopoly power over the Digital-Wallet Aftermarket, and even if Everi has not yet monopolized the broader Digital-Wallet Markets, it has expressed its specific intent to do so and, by virtue of its tying and exclusive dealing, there is a dangerous probability that Everi will succeed. Its success will be assured by the merger with IGT.

306.    Everi's monopoly or near-monopoly power in the Digital-Wallet Markets and Aftermarket is demonstrated by its overwhelming market share and through its ability to impose supracompetitive financial terms on casinos and patrons while providing them a sub-competitive product, as alleged in further detail above.

307.    Furthermore, as a direct result of Everi's anticompetitive conduct, Koin has suffered injury in fact. Everi's anticompetitive conduct has harmed Koin by depriving it of profits that it otherwise would have realized from casinos and from patrons—both through its partnerships with Baldini's and Eureka and through the other business opportunities that Koin was and would be winning but for Everi's anticompetitive conduct. As alleged above, Koin has suffered and will suffer tens of millions of dollars of damages as a result of Everi's anticompetitive conduct, including damages from lost profits, lost business opportunities, and reputational and operational harm.

308.    The injuries and losses suffered by Koin constitute antitrust injury because they represent an injury of the type the antitrust laws were intended to prevent and flow directly from

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

51

Everi's anticompetitive conduct described above, including Everi's monopolistic tying and exclusive dealing, and Koin is optimally situated to force Everi's compliance with antitrust law.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Koin hereby demands a trial by jury of all issues so triable.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Koin Mobile, LLC respectfully requests that the Court enter judgment in its favor and against Defendants Everi Holdings Inc. and Everi Payments Inc. and grant relief as follows:

a) On Koin's First through Fifth Claims for Relief, awarding Koin damages arising from its lost profits, lost business opportunities, and other harms caused by Everi's exclusionary conduct, trebled pursuant to federal antitrust law;

b) On Koin's Sixth through Eighth Claims for Relief, awarding Koin damages arising from its lost profits, lost business opportunities, and other harms caused by Everi's exclusionary conduct, trebled pursuant to Nevada antitrust law;

c) Awarding permanent injunctive relief barring enforcement of Everi's anticompetitive tying and exclusive dealing agreements;

d) Additional damages and equitable relief as proven at trial;

e) Applicable interest;

f) Attorneys' fees and other costs pursuant to statute; and

g) Such other and further relief as the Court deems just and proper.

DATED this 19th day of April 2024.

By: */s/ Robert C. Ryan*
Robert C. Ryan
Timothy A. Lukas
Joshua M. Halen
5441 Kietzke Lane, Suite 200
Reno, NV 89511
(775) 327-3000
rcryan@hollandhart.com
tlukas@hollandhart.com
jmhalen@hollandhart.com

Paul D. Swanson (*pro hac vice* forthcoming)
Nicholas W. Katz (*pro hac vice* forthcoming)
555 17th Street, Suite 3200
Denver, CO 80202
(303) 295-8000
pdswanson@hollandhart.com
nwkatz@hollandhart.com

*Attorneys for Plaintiff*