Robert C. Ryan (Nevada Bar No. 7164)
Timothy A. Lukas (Nevada Bar No. 4678)
Joshua M. Halen (Nevada Bar No. 13885)
HOLLAND & HART LLP
5470 Kietzke Lane, Suite 100
Reno, Nevada 89511
Tel: (775) 327-3000 | Fax: (775) 786-6179
rcryan@hollandhart.com
tlukas@hollandhart.com
jmhalen@hollandhart.com

Paul D. Swanson (Colorado Bar No. 50923)
  *pro hac vice*
Nicholas W. Katz (Colorado Bar No. 55136)
  *pro hac vice*
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, Colorado 80202
Tel: (303) 295-8000 | Fax: (303) 479-9424
pdswanson@hollandhart.com
nwkatz@hollandhart.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| KOIN MOBILE, LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>EVERI HOLDINGS INC., f/k/a Global Cash Access Holdings, Inc., a Delaware Corporation, and EVERI PAYMENTS INC., f/k/a Global Cash Access, Inc., a Delaware Corporation,<br><br>Defendants. | **CASE NO.: 3:24-cv-00178-ART-CSD**<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION**<br><br>**ORAL ARGUMENT REQUESTED** |

Plaintiff Koin Mobile, LLC ("Koin"), by and through counsel Holland & Hart LLP, hereby responds to the Motion to Dismiss Plaintiff's Complaint and Memorandum of Points and Authorities in Support Thereof (the "Motion," ECF No. 31) filed by Defendants Everi Holdings Inc. and Everi Payments Inc. (together, "Everi"). Koin's opposition is based on the below Memorandum of Points and Authorities in Opposition to the Motion, Koin's Complaint (ECF No. 1), materials referenced therein, any oral argument the Court may entertain, and all other matter considered by the Court in relation to the Motion.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

   1. The Relevant Cash-Access and Digital-Wallet Markets ........................................3

   2. Everi's Dominance of the Cash-Access Markets.....................................................4

   3. Everi's Anticompetitive Takeover of the Digital-Wallet Markets ..........................5

LEGAL STANDARD.........................................................................................................6

ARGUMENT ...................................................................................................................7

   I.  CASH-ACCESS SYSTEMS AND DIGITAL WALLETS ARE DIFFERENT
       PRODUCTS OCCUPYING DIFFERENT MARKETS. .........................................7

      A.  Different Suppliers and Different Demand Signify Different Products.......................7

      B.  Non-Interchangeable Products for Which Demand Is Not Cross-Elastic
          Occupy Different Markets. ...............................................................................8

   II.  EVERI HARMS DIGITAL-WALLET COMPETITION BY LEVERAGING ITS
       CASH-ACCESS MARKET POWER TO FORCE USE OF ONLY ITS WALLET.........14

      A.  Everi Dominates the Cash-Access Markets. ........................................................14

      B.  Everi Forces All Its Cash-Access Customers to Use Its Digital Wallet...................17

      C.  By Leveraging Its Cash-Access Products, Everi Ties Up a Not Insubstantial
          Amount of Digital-Wallet Commerce—More Than Half the Market. .................20

   III. EVERI'S INDEFINITE EXCLUSIVE AGREEMENTS SUBSTANTIALLY
       FORECLOSE COMPETITION WITHOUT JUSTIFICATION. .......................................21

   IV. PATRONS AT CASINOS UNDER CONTRACT WITH EVERI UNWITTINGLY
       LOCK INTO AN AFTERMARKET THEY CANNOT REASONABLY LEAVE. ..........23

   V.  EVERI IGNORES THE BULK OF THE COMPLAINT AND ITS OWN
       ADMISSIONS IN ARGUING THAT KOIN IS NOT A COMPETITOR. ........................27

CONCLUSION...............................................................................................................29

1

## TABLE OF AUTHORITIES

2

3

**Page(s)**

### CASES

4

*Advance Bus. Sys. & Supply Co. v. SCM Corp.*,

5
    415 F.2d 55 (4th Cir. 1969) ...........................................................................19

6
*Anderson Foreign Motors, Inc. v. New Eng. Toyota Distribs., Inc.*,
    475 F. Supp. 973 (D. Mass. 1979) .................................................................19

7

8
*Apple Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) .........................................................26

9
*Borden, Inc. v. FTC*,
    674 F.2d 498 (6th Cir. 1982) .........................................................................17

10

11
*Brown Shoe Co. v United States*,
    370 U.S. 294 (1962) ...................................................................................9, 10

12

13
*Byars v. Bluff City News Co.*,
    609 F.2d 843 (6th Cir. 1979) .........................................................................17

14
*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) .........................................................................11

15

16
*CollegeNet, Inc. v. Common Application, Inc.*,
    355 F. Supp. 3d 926 (D. Or. 2018) ...............................................................21

17

18
*Collier v. New York*,
    2006 U.S. Dist. LEXIS 111127 (C.D. Cal. Nov. 1, 2006)........................18, 19

19
*Crownalytics, LLC v. Spins LLC*,
    2023 U.S. Dist. LEXIS 72072 (D. Colo. Apr. 25, 2023).................................18

20

21
*Dairy, LLC v. Milk Moovement, Inc.*,
    2023 U.S. Dist. LEXIS 83790 (E.D. Cal. May 12, 2023)...............................16

22

23
*DAT Sols., LLC v. Convoy, Inc.*,
    2023 U.S. Dist. LEXIS 70734 (D. Or. Apr. 24, 2023) ...................................16

24
*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
    36 F.3d 1147 (1st Cir. 1994)..........................................................................19

25

26
*Datagate, Inc. v. Hewlett-Packard Co.*,
    60 F.3d 1421 (9th Cir. 1995).........................................................................18

27

*Datel Holdings Ltd. v. Microsoft Corp.*,
    712 F. Supp. 2d 974 (N.D. Cal. 2010) .................................................. 21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................... *passim*

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ................................................ 17, 26, 27

*Ernst & Haas Mgmt. Co. v. Hiscox, Inc.*,
    23 F.4th 1195 (9th Cir. 2022) .................................................... 6, 7

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
    394 U.S. 495 (1969) .............................................................. 7, 20

*Frame-Wilson v. Amazon.com, Inc.*,
    591 F. Supp. 3d 975 (W.D. Wash. 2022) ............................................ 13

*FTC v. Meta Platforms Inc.*,
    654 F. Supp. 3d 892 (N.D. Cal. 2023) ............................................. 10

*FTC v. Warner Commc'ns Inc.*,
    742 F.2d 1156 (9th Cir. 1984) ................................................ 10, 12

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) ................................................... 13

*Geneva Pharms. Tech. Corp v. Barr Lab'ys Inc.*,
    386 F.3d 485 (2d Cir. 2004) ...................................................... 16

*Hardy v. City Optical Inc.*,
    39 F.3d 765 (7th Cir. 1994) ................................................... 15, 16

*Her Majesty the Queen in Right of Can. v. Van Well Nursery, Inc.*,
    2022 U.S. Dist. LEXIS 684 (E.D. Wash. Jan. 3, 2022) ............................. 12

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018) ................................................ 22

*Hughes Tool Co. v. Ford*,
    114 F. Supp. 525 (E.D. Okla. 1953) .............................................. 13

*IGT v. All. Gaming Corp.*,
    2006 U.S. Dist. LEXIS 111962 (D. Nev. Jan. 10, 2006) ............................. 6

*ILC Peripherals Leasing Corp. v. IBM Corp.*,
    458 F. Supp. 423 (N.D. Cal. 1978) .............................................. 15

*In re ATM Fee Antitrust Litig.*,
  768 F. Supp. 2d 984 (N.D. Cal. 2009) ...................................................................27

*In re Webkinz Antitrust Litig.*,
  2010 U.S. Dist. LEXIS 111810 (N.D. Cal. Oct. 20, 2010).........................................8

*Innovative Health, LLC v. Biosense Webster, Inc.*,
  2024 U.S. App. LEXIS 308 (9th Cir. Jan. 5, 2024) ................................................26

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
  737 F.2d 698 (7th Cir. 1984) ....................................................................................8

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)..................................................................................................7, 8

*Klein v. Facebook, Inc.*,
  580 F. Supp. 3d 743 (N.D. Cal. 2022) ...........................................................8, 14, 22

*Las Vegas Sun, Inc. v. Adelson*,
  2022 U.S. Dist. LEXIS 53023 (D. Nev. Mar. 23, 2022).........................................17

*Little Caesar Enters., Inc. v. Smith*,
  172 F.R.D. 236 (E.D. Mich. 1996) ..........................................................................19

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
  275 F.3d 762 (9th Cir. 2001) ..................................................................................10

*Moore v. Jas. H. Matthews & Co.*,
  473 F.2d 328 (9th Cir. 1972) .............................................................................15, 16

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
  909 F.2d 1245 (9th Cir. 1990) ................................................................................16

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*,
  593 F. Supp. 1506 (N.D. Cal. 1984) .......................................................................19

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958)...............................................................................................18, 20

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ...........................................................................25, 26

*NRT Tech. Corp. v. Everi Holdings Inc.*,
  2020 U.S. Dist. LEXIS 108233 (D. Del. June 19, 2020)........................................10

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)................................................................................................17

*Olin Corp. v. FTC*,
    986 F.2d 1295 (9th Cir. 1993) ........................................................................10

*Olsen v. Nevada*,
    2023 U.S. Dist. LEXIS 174965 (D. Nev. Sept. 29, 2023) ...........................6

*Patt v. Antech Diagnostics, Inc.*,
    2020 U.S. Dist. LEXIS 160220 (C.D. Cal. May 18, 2020) .........................22

*Photovest Corp. v. Fotomat Corp.*,
    606 F.2d 704 (7th Cir. 1979) ....................................................................9, 12

*Pinnacle Sys., Inc. v. XOS Techs., Inc.*,
    2003 U.S. Dist. LEXIS 27729 (N.D. Cal. May 19, 2003) ..........................13

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*,
    662 F.2d 641 (9th Cir. 1981) ......................................................................18

*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*,
    754 F.3d 754 (9th Cir. 2014) ........................................................................1

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ........................................................................9

*Rhino Sports, Inc. v. Sport Court, Inc.*,
    2007 U.S. Dist. LEXIS 25687 (D. Ariz. Apr. 5, 2007)..................................9

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
    532 F.3d 963 (9th Cir. 2008) ......................................................................15

*RSR Corp. v. FTC*,
    602 F.2d 1317 (9th Cir. 1979) ....................................................................10

*Safeway Inc. v. Abbott Lab'ys*,
    761 F. Supp. 2d 874 (N.D. Cal. 2011) ........................................................16

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    434 F. Supp. 3d 782 (N.D. Cal. 2020) ........................................................12

*Sidibe v. Sutter Health*,
    667 F. App'x 641 (9th Cir. 2016) ..................................................................9

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*,
    284 F.2d 1 (9th Cir. 1960) ..........................................................................15

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ....................................................................12

*Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*,
    815 F.2d 1407 (11th Cir. 1987) ........................................................19

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)............................................................9

*Twin City Sportservice, Inc. v. Charles O'Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ........................................................8

*United States v. Aluminum Co. of Am.*,
    377 U.S. 271 (1964)......................................................................11

*United States v. Mercedes-Benz of N. Am., Inc.*,
    517 F. Supp. 1369 (N.D. Cal. 1981) ..............................................19

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)..........................................................11

*W. Parcel Express v. UPS of Am., Inc.*,
    190 F.3d 974 (9th Cir. 1999) ........................................................16

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)..........................................................23

vii

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO THE MOTION

### INTRODUCTION

Koin's well-pleaded allegations plausibly state claims for relief.  In short, Everi dominates the cash-access markets for gaming through specialized gaming kiosks, ATMs, and other cash-access systems.  Leveraging that dominance, Everi forces casinos and their patrons to forgo, indefinitely, using digital wallets offered by Everi's competitors.  In this way, just a few years after regulators first approved gaming digital wallets, Everi has locked up well over half that market.  Worse, after its forthcoming merger with International Gaming Technology ("IGT"), Everi's dominance of the digital-wallet markets will exceed 75% market share. Through tying and exclusive dealing, Everi has foreclosed competition in digital wallets, and it will soon achieve a monopoly if it has not done so already.

Everi's Motion disputes all that, but the problem for Everi is that it has already admitted the core allegations here.  Everi admits it dominates the cash-access markets.  Compl. ¶¶ 4, 52, 133.  Everi admits it engaged in elaborate tying strategies to expand that power to new markets. *Id.* ¶ 16.  And in its state action against Koin—which the state court stayed last month in deference to the federal antitrust issues in this case—Everi admits this scheme is not limited to a few casinos.  Rather, based on its "exclusive contractual relationships," Everi contends that "any current customer of Everi's cash access services [is] required to use the Everi CashClub Wallet." First Am. Compl. ("Everi State FAC," **Ex. A** hereto) at 4 ¶ 21, *Everi Payments Inc. v. Strategic Gaming Mgmt., LLC, et al.*, No. CV23-01538 (Washoe Cnty. Sept. 7, 2023) ("*Everi v. Koin*").[1]

Having painted itself into a corner, Everi throws a series of misfit arguments at the Court. But nothing sticks.

Product Market Definition.  Koin alleges separate cash-access and digital-wallet markets, which Everi insists are one in the same.  This defies Koin's allegations and basic common sense.

---

[1] "The Court may judicially notice documents filed in a collateral state court action." Mot. at 5 n.2 (citing *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 756 n.1 (9th Cir. 2014)).

Besides Everi, suppliers separately provide cash-access or digital-wallet products; casinos and patrons seek them separately; and they have different uses, price, and quality. Further, a habitual cash-carrying casino patron will not switch to a digital-wallet app based on a small shift in cash-access pricing, nor will a tech-savvy digital-wallet user swap out their phone-based app for cash if digital-wallet fees inch up. Demand is not cross-elastic. Casinos thus desire both systems, often from separate providers, not just one or the other. Digital wallets and cash-access systems may have one purpose in common—funding casino play—but they do not belong in the same market any more than a modern car occupies the same market as a horse and buggy. As Koin's Complaint alleges in detail, digital wallets and cash-access systems are not reasonably interchangeable in the eyes of customers, so the two products are in different markets.

Tying and Exclusive Dealing. Koin's allegations also make out plausible claims of tying and exclusive dealing. Everi's form contract, which according to Everi forbids its customers from using non-Everi digital wallets, expressly imposes a negative tie that is presumptively coercive—a legal principle Everi overlooks. And besides the express contractual tie-in, Everi's coercion is manifest in its successful ouster of competing digital-wallet providers that Everi's cash-access customers wished to contract with instead of with Everi. Through its tying arrangement—and in conjunction with its five-year exclusive agreements, which automatically renew every three years and can't be terminated by casinos without giving Everi a right of first refusal—Everi has more than "substantially foreclosed" the digital-wallet markets. After thwarting competition in more than half of the digital-wallet markets Koin alleges, Everi is dangerously close to monopolizing them, if it has not done so already.

Aftermarket. Koin also alleges—as an alternative to its attempted monopolization claims—that Everi has monopolized the "aftermarket" for patron digital-wallet transactions at casinos under cash-access contract with Everi. Because those patrons chose casinos without adequate information about the digital wallet at the casino or the cost to use it, and because the patrons would have to forfeit valuable casino perks to switch to a different casino with a different digital wallet later on, those patrons are locked in. As a result, they will absorb monopoly

pricing for Everi's digital wallet.  Seeking an alternative at another casino would cost them more in lost perks meted out by their chosen casino—"comped" hotel rooms, meals, drinks, gaming credits.  For locked-in customers like these, preventing monopolization of a narrowly drawn aftermarket is the only way to ensure competition and the consumer benefits that flow from it.  Everi's account ignores market realities in the casino industry.

<u>Antitrust Injury</u>.  Finally, after Everi sued Koin for competing in a way it deemed unfair and despite admitting in its Motion that Koin is a competitor, Everi turns about-face to argue that Koin's wallet does not compete with Everi's, so Koin cannot sue for antitrust violations.  This last misfit argument is inconsistent with Everi's own allegations and arguments and contrary to even the most cursory review of Koin's allegations.

In sum, Koin's allegations amply support its claims.  For the reasons above and those set forth below, the Court should deny Everi's motion to dismiss.

## BACKGROUND

### 1. *The Relevant Cash-Access and Digital-Wallet Markets*

It takes money to play in a casino, and there are two principal ways to fund gameplay—cash and digital wallets.  Compl. ¶¶ 1, 6.  Everi has long dominated the market for cash access at casinos through its specialized kiosks, ATMs, and other cash-access systems.  *Id.* ¶¶ 2-4, 52-55, 208.  Using that array of systems, Everi turns patrons' credit cards, charge cards, and debit cards into dollar bills.  *Id.* ¶¶ 56, 123-125, 152, 211.  Casinos obtain cash-access systems like Everi's by contracting with the provider, but then the casino's patrons make their own choice on the casino floor about how to fund their gameplay.  *Id.* ¶¶ 48-49, 114-122, 152-158.  So cash-access providers have two categories of customers: (i) the casinos who let them in the door and (ii) the patrons who choose to use the cash-access products the casino has selected.  *Id.* ¶¶ 146, 148, 150-151, 155.

Digital wallets are new to gaming—approved by regulators in 2020 and only now taking off nationwide.  *Id.* ¶¶ 6, 61-62, 77.  Like cash, digital wallets fund gameplay, but they do so in different ways.  *Id.* ¶¶ 7-8, 63.  First, funding is managed through an app on a patron's phone that

can be tied to various funding sources—such as credit cards, charge cards, and debit cards, as well as inter-user app transfers, EFTs, and wires—yet all without disclosing these funding sources to a casino, or vice versa. *Id.* ¶¶ 6, 63, 66. Second, the patron can set limits on their gameplay, utilize security protocols to avoid theft and loss, access credit almost instantaneously, and avoid transactions with germ vectors like cash. *Id.* ¶¶ 61-62, 64-65, 67, 74-75. Third, patrons can do all the above without leaving their favorite slot machine or table game, or from the comfort of their home or hotel room. *Id.* ¶¶ 7, 9, 64. Casinos also enjoy benefits from digital wallets that cash-access systems don't provide—increased game lift and decreased time to play, monitoring for problematic gambling, throttling tools to cut off patrons without a physical confrontation, patron and gameplay tracking, illicit activity reporting, reduction of expensive and risky cash reserves, and extensive backend software to manage the intersection between finance and casino operations. *Id.* ¶¶ 7-9, 59-60, 67-75, 94-96.

Given the differences between cash-access systems and digital wallets, demand for each is unique. *Id.* ¶¶ 139-141, 147-148, 162, 165. Patrons who prefer cash will not readily switch to digital wallets, nor will digital-wallet users switch to cash. *Id.* Because some patrons demand one and won't use the other, casinos now offer both and frequently seek different providers for cash-access systems and for digital wallets. *Id.* ¶¶ 105, 108, 111-112, 141, 162-163. Given these differences in demand, it is little surprise that the pricing structure for cash access and digital wallets in casinos differ. *Id.* ¶¶ 123-125, 152, 211, 221-222.

       2.    *Everi's Dominance of the Cash-Access Markets*

Everi has dominated the market for cash-access systems in casinos for more than a decade. *Id.* ¶¶ 2-4, 53-54, 133, 207-208. It controls between 75% and 90% of all cash-access transactions. *Id.* This dominance is reflected in the fact that Everi provides roughly $40 billion per year in cash to casino floors, where casinos generate only about $45 billion in net gaming revenue, as well as in Everi's 95% margin in this business line. *Id.* ¶¶ 4, 52, 54, 127-128, 210. Given its dominance, Everi transaction fees can run as high as 20% for cash access and, with almost no competition, Everi does not lose business despite such exorbitant fees. *Id.* ¶¶ 123-124,

208-213.  Everi also unilaterally controls what casinos earn—or don't earn—from cash-access

transactions processed on their premises.  *Id.* ¶¶ 125-126, 208.  Everi maintains its dominance

because new competitors cannot readily enter the highly regulated gaming-finance world and

because Everi has established a wall of long-term exclusive contracts that prevent competitors

from courting Everi customers with better offers.  *Id.* ¶¶ 48-51, 114-121, 143-144, 184, 187-193,

196-200, 230-231, 236-237.

             *3.*      *Everi's Anticompetitive Takeover of the Digital-Wallet Markets*

        Brandishing its dominance over the cash-access markets, Everi has forced its cash-access

customers to forgo any digital wallet that competes with Everi's.  *Id.* ¶¶ 5, 15-22, 55, 107-114,

131, 179-186.  As a condition of obtaining Everi's cash-access products, those customers may

use and offer to their patrons *only* Everi's digital wallet.  *Id.*  According to Everi, its "exclusive

contractual relationships" mean that "any current customer of Everi's cash access services [is]

required to use the Everi CashClub Wallet."  Ex. A, Everi State FAC at 4 ¶ 21.  That exclusivity

lasts for an initial five-year period under Everi's standard-form contracts, with automatic three-

year renewals, and a right of first refusal in Everi's favor if a casino seeks to part ways with

Everi.  Compl. ¶¶ 116-119, 188-189.

        Everi has imposed its purported exclusivity rights on casinos across the country.  *Id.*

¶¶ 2, 20, 29, 110-113, 154, 158, 163, 167, 185, 191-193.  Everi has broken up contracts between

casinos and other digital-wallet providers based on these exclusivity rights, and in 2023, Everi

sued Baldini's Sports Casino and Koin for violating its claimed exclusivity rights.  *Id.*

¶¶ 105-113.[2]  In this way, Everi has ported its dominance in the cash-access markets to the

markets for digital wallets.  *Id.* ¶¶ 22, 184, 217.  In the four years since digital wallets were

---

[2] Koin moved to dismiss Everi's claims, in part, on the basis that Everi's exclusivity over
"quasi-cash" transactions should not reach digital wallets, but the state court denied the motion.
*See* Defs.' Mot. to Dismiss Pl's. First Am. Compl., *Everi v. Koin* (Oct. 13, 2023) (**Ex. B** hereto);
Order on Defs.' Mot. to Dismiss, *Everi v. Koin* (Apr. 4, 2024) (**Ex. C** hereto).  When the state
court did not dismiss Everi's anticompetitive construction of "quasi-cash" exclusivity, Koin filed
this action.  Since then, the state court granted Koin's request to stay *Everi v. Koin*—including
Koin's parallel state law antitrust counterclaims—because the federal antitrust issues in this case
may resolve entirely the state-court dispute, including the enforceability of Everi's exclusive
contracts.  Order Granting Defs.' Mot. to Stay, *Everi v. Koin* (Aug. 16, 2024) (**Ex. D** hereto).

approved by regulators, Everi has come dangerously close to monopolizing the digital-wallet markets (if it has not done so already), and its digital-wallet market share will exceed 75% after its forthcoming merger with IGT. *Id.* ¶¶ 27-28, 135-136, 142, 195, 218, 225, 273, 276-277, 305.

Alternatively, Everi already has a monopoly over the market for patrons using digital wallets in casinos where Everi has a cash-access contract. *Id.* ¶¶ 194, 226. Those patrons choose a casino for a variety of reasons but without information about the supracompetitive cost and substandard quality of the digital wallet the casino provides from Everi. *Id.* ¶¶ 169-175. Once cost and quality become apparent, though, it is too late for those customers to switch to a different casino with a better digital wallet (if any alternatives remain in that patron's area despite Everi's widespread exclusive contracts). *Id.* ¶¶ 169-170, 173-175, 193, 213, 231. That is because the value of a better wallet with lower fees at a different casino is dwarfed by the cost of forfeiting accrued perks at the casino where the patron has been playing—complimentary hotel rooms, meals, and other valuable consideration. *Id.* ¶¶ 169, 174. As a result, those patrons are locked in, and Everi can and does impose supracompetitive fees for a substandard product without losing their business. *Id.* ¶¶ 175, 220-226.

## LEGAL STANDARD

"It is axiomatic that the motion to dismiss . . . is viewed with disfavor and is rarely granted." *Ernst & Haas Mgmt. Co. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022) (omission in original) (quotation omitted). That is because a properly pleaded complaint need provide only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Olsen v. Nevada*, 2023 U.S. Dist. LEXIS 174965, at *5 (D. Nev. Sept. 29, 2023) (Traum, J.) (quotation omitted). The Court "must view all allegations in the complaint in the light most favorable to the non-movant and must accept all material allegations—as well as any reasonable inferences to be drawn from them—as true." *IGT v. All. Gaming Corp.*, 2006 U.S. Dist. LEXIS 111962, at *5 (D. Nev. Jan. 10, 2006). Accordingly, dismissal is improper unless "it appears beyond doubt that [the] plaintiff can prove no set of facts in support of its claims which would entitle it to relief." *Ernst & Haas Mgmt.*, 23 F.4th at 1199 (quotation omitted).

6

1
ARGUMENT

2 **I.    CASH-ACCESS SYSTEMS AND DIGITAL WALLETS ARE DIFFERENT
   PRODUCTS OCCUPYING DIFFERENT MARKETS.**

3

4           Everi contends that cash-access systems and digital wallets are not distinct products and

5 therefore do not occupy separate markets.  Suppliers and customers, however, treat them as

6 distinct products, separately saleable and not interchangeable.  Although cash-access systems

7 and digital wallets both bring funds to casino floors, they are different products that satisfy

8 distinct demand in separate markets.

9           **A.    Different Suppliers and Different Demand Signify Different Products.**

10          Koin's tying claims allege, as they must, that Everi sells "two separate products."  *See*

11 *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 507 (1969).  In passing, Everi asserts that

12 cash-access systems and digital wallets are the same product.  Mot. at 11.  Everi's contention

13 defies common sense (a specialized, fixed-location cash-dispensing machine is the same product

14 as a mobile smartphone app with secure, contactless payment and other tools?), but more

15 importantly, it flatly contradicts Koin's detailed allegations.

16          "[T]he answer to the question whether one or two products are involved turns . . . on the

17 character of the demand for the two items"—that is, whether the products are "distinguishable in

18 the eyes of buyers."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984).  Here,

19 customers can—and would prefer to—obtain cash-access systems and digital wallets separately.

20 *See id.* at 22.  As alleged, many customers seek cash-access systems from Everi and, separately,

21 digital wallets from specialized vendors like Koin.  Compl. ¶¶ 105, 108, 111-113, 204.  Indeed,

22 Everi has historically provided only cash-access systems, and Koin markets only digital wallets,

23 so there is clear evidence of sufficiently separate "consumer demand so that it is efficient for a

24 firm to provide" these products separately.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*,

25 504 U.S. 451, 462 (1992) (holding that separate sales of copier parts and copier services showed

26 separate products); Compl. ¶¶ 52-53, 77-80, 98-100, 162 (digital wallets "uniquely demanded by

27 certain patrons who prefer not to carry and use cash"), ¶ 165 ("[D]emand for digital wallets is

separate from and not substitutable by cash for patrons who have shifted to cashless lifestyles or who require the safeguards and gaming limits that digital wallets provide. . . .").  Moreover, because jointly providing these products implicates few, if any, economies in production or consumption, Compl. ¶¶ 204, 206, they constitute separate products.  *See Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 703 (7th Cir. 1984) (Posner, J.).  The law and the facts show two products at issue here, not one.

### B.    Non-Interchangeable Products for Which Demand Is Not Cross-Elastic Occupy Different Markets.

In a related argument, Everi challenges Koin's market definitions.  It does not dispute the geographic scope of Koin's markets, however, nor does it contest Koin's differentiation of casino markets and patron markets.  Everi challenges Koin's alleged market definitions only insofar as Koin alleges that cash-access systems and digital wallets occupy separate product markets.  Mot. at 8-10.  But, as just noted, there is distinct demand for cash-access systems and digital wallets, which on its own supports a plausible inference that the two are not just separate products, but separate products in different markets.  *See Jefferson Parish*, 466 U.S. at 21-22 (pleading "sufficient demand for" tied product "separate from" the tying product "identif[ies] a distinct product market").

A more exacting assessment of Koin's market definitions is inappropriate at this stage.  Defining "'the relevant market is basically a fact question dependent upon the special characteristics of the industry involved.'"  *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 765 (N.D. Cal. 2022) (quoting *Twin City Sportservice, Inc. v. Charles O'Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982)); *accord In re Webkinz Antitrust Litig.*, 2010 U.S. Dist. LEXIS 111810, at *11-12 (N.D. Cal. Oct. 20, 2010) (rejecting market-definition challenge because "extensive analyses of reasonable interchangeability and cross elasticity of demand" are unnecessary at motion-to-dismiss stage where market "does not appear unduly farfetched" (quotation omitted)).  Thus, the "validity" of a relevant market is "more appropriately addressed at summary judgment or trial."  *Sidibe v. Sutter Health*, 667 F. App'x 641, 643 (9th Cir. 2016)

1  (reversing dismissal after district court rejected market allegations, because at "pleading stage,

2  plaintiffs were not required to allege evidentiary facts"); *see also Rhino Sports, Inc. v. Sport*

3  *Court, Inc.*, 2007 U.S. Dist. LEXIS 25687, at *11-13 (D. Ariz. Apr. 5, 2007) (dismissal based on

4  market definitions warranted only upon "failure even to attempt a plausible explanation as to

5  why a market should be limited in a particular way" and to "single brand" markets lacking valid

6  aftermarket allegations (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001))).

7       Even so, a more exacting examination only confirms the plausibility of Koin's market

8  definitions.  Cash-access products and digital wallets occupy different markets because

9  customers do not switch between them based on price.  Compl. ¶¶ 139-141, 147.  Put differently,

10  when a casino or a patron seeks a digital wallet for the casino floor, they will not shift to cash

11  based on a material price increase for the digital wallet, or vice versa.  *Id.* ¶¶ 162, 165.

12  Cash-access products therefore are not reasonably interchangeable with digital wallets, and

13  demand for them is not cross-elastic.  These are the hallmarks of different products in different

14  markets.  *See Brown Shoe Co. v United States*, 370 U.S. 294, 325 (1962).

15       Moreover, the pricing structure between the two is entirely different.  *See Photovest*

16  *Corp. v. Fotomat Corp.*, 606 F.2d 704, 713-14 (7th Cir. 1979) (drive-thru photo processing, for

17  which consumers paid a premium, was relevant market apart from conventional photo

18  processing), *applied by Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995).

19  Casinos earn less from—and in fact must contribute a portion to—each digital-wallet transaction,

20  whereas they simply take part of the rake from cash-access transactions.  Compl. ¶¶ 125, 221.

21  Patrons pay Everi substantial fees and charges, independent of third-party fees, for each

22  transaction and dollar accessed when using cash-access systems, yet they bear only third-party

23  fees and corresponding markups when using digital wallets.  *Id.* ¶¶ 123-124, 211, 222.

24       Apart from these factors, other "practical indicia" support the inference that cash-access

25  systems and digital wallets occupy different markets.  *See Brown Shoe*, 370 U.S. at 325.[3]  The

26  ─────────────────────────────

27  [3] "Because every market that encompasses less than all products is, in a sense, a submarket," the *Brown Shoe* factors for defining submarkets "are relevant even in determining the primary market to be analyzed."  *Olin Corp. v. FTC*, 986 F.2d 1295, 1299 (9th Cir. 1993).

gaming industry recognizes digital wallets as a new technology, separately regulated and authorized from cash-access systems.  Compl. ¶¶ 16, 75, 77, 105-112; *see Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 768 (9th Cir. 2001) (heeding industry distinction between major-brand and private-label vintage tires); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1163 (9th Cir. 1984) (finding antitrust market for prerecorded music that the industry regarded as distinct from recorded music).[4]  The two products also rely on entirely different hardware and technology—manufacturing gaming-specific kiosks and other specialized cash-processing systems has virtually no relation to developing a mobile smartphone app and complex back-end software for a digital wallet.  Compl. ¶¶ 49, 63, 204; *see RSR Corp. v. FTC*, 602 F.2d 1317, 1320-22 (9th Cir. 1979) (affirming FTC divestiture order and concluding that different production facilities for hard and soft lead differentiated their markets); *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 911-19 (N.D. Cal. 2023) (finding virtual-reality fitness firms existed in separate market from general fitness firms and general virtual-reality firms, neither of which have production facilities to produce virtual-reality fitness apps).

Without addressing any of these factors that support the inference of separate markets, Everi latches onto the allegation that, in a post-COVID world, casinos desired "a viable alternative to cash" that digital wallets satisfy.  Mot. at 8-9.  But this obvious statement does not mean the two are "roughly equivalent," as Everi argues.  Even if two products do a particular "job equally well" and target the same "class of customers," they may nevertheless occupy different markets based on a lack of demand cross-elasticity and differences in price, production,

---

[4] Gaming industry regulations—as well as much higher transaction fees and specialized features that permit patrons to access funds even when an account reaches its daily withdrawal limit—also distinguish casino cash-access systems from general ATMs and cash-back options outside casinos.  Compl. ¶¶ 48-51, 153, 156.  For these reasons, Everi's objection to a separate market for casino cash-access systems, Mot. at 10 n.3, is misplaced and has previously been rejected by other courts, *see NRT Tech. Corp. v. Everi Holdings Inc.*, 2020 U.S. Dist. LEXIS 108233, at *21-22 (D. Del. June 19, 2020) (denying motion to dismiss NRT's antitrust claims against Everi that identified relevant product market as market for gaming-specific kiosks and excluded traditional ATMs), *adopted*, 2020 U.S. Dist. LEXIS 176177 (D. Del. Sept. 25, 2020).  Moreover, if anything, "experience and common sense" demonstrate that patrons will not wish to carry large sums of cash while walking down a street in Las Vegas or Reno or Atlantic City and are disinclined to leave a casino floor to find a generic ATM—if one can be found at all in gaming districts where nearly every foot of real estate is casino-owned.

and overall functionality.  *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 276-77 (1964); *see also United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003) (affirming judgment of Section 1 liability where credit and charge cards were found to be in a different market from cash, checks, and debit cards that were shown not to be reasonable substitutes).  Moreover, Everi's gloss of "rough equivalency" elides the Complaint's allegations showing the "distinct role and value" of digital wallets and cash-access systems for casinos and patrons.  *See Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 508-09 (9th Cir. 2010) (reversing district court's determination that emerging market for expiring domain names was not distinct from general market for domain names in light of different use and demand profiles).

On the one side, cash-access products serve one function: put cash on the casino floor.  Compl. ¶¶ 49, 156.  For the casino, this ensures a steady flow of funding that fuels profits from patron activity and a readout of cash entering circulation on its premises.  *Id.* ¶¶ 50, 152.  For patrons, cash-access products let them fund play without leaving the casino.  *Id.* ¶¶ 47-50, 155.

Digital wallets, in contrast, give customers far more.  They not only fund profitable gaming for casinos—they allow casinos to reduce their high-cost, high-risk cash stores; track patron preferences; assess game popularity and trends; monitor illicit financial activity; control patron use of complimentary funds and credit; throttle problematic gaming; and synch their casino management systems with real-time data about patrons, games, and transactions.  *Id.* ¶¶ 6-9, 59-60, 67-76, 162.  Given these savings and other benefits, it is little wonder that casinos are willing to pay a small fee for each transaction and forgo the cut they receive from cash-access transactions.  *Compare id.* ¶ 125 (casino gets share of cash-access transaction), *with id.* ¶ 221 (casino pays dozens of basis points per digital-wallet transaction).  Patrons likewise obtain more than just funds: frictionless credit transactions; hard-wired spending limits; contactless payment; sophisticated transaction security; and instant access to multiple funding sources without leaving their seat on the casino floor.  *Id.* ¶¶ 6-7, 9, 63-67, 165.

In sum, digital wallets are easier to use and offer more features with a sleeker user experience than cash-access systems.  *See Warner Commc'ns*, 742 F.2d at 1163-64 (finding

11

indicia of separate markets based on "ready-to-play" nature and "attractive package" of one product but not the other.)[5]  "[A]lthough the end product" of the cash-access system and the digital wallet may be similar, "the total service is quite different."  *Photovest*, 606 F.2d at 714.

Thus, just because cash-access systems and digital wallets achieve a similar funding function does not mean they occupy the same market.[6]  Riding in a yellow taxi may serve a roughly equivalent purpose to riding in an Uber, but the varying qualities, prices, and uses of the two systems plausibly place them in different markets.  *SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 792 (N.D. Cal. 2020) ("Uber argues that Sidecar's alleged market of app-based ride-hailing services, excluding taxis, defies common sense. It is certainly possible that ride-hailing companies like Uber compete against taxi companies . . . .  At this stage of the case, however, the Court takes Sidecar's factual allegations as true.").  Similarly, a local Albertsons may fill a customer's home with groceries and goods just as well as Amazon, but that does not mean ecommerce retail stores and physical retail stores occupy the same antitrust market. *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 990 (W.D. Wash. 2022) (denying motion to dismiss challenging "distinction between the ecommerce retail market and the physical retail market" and explaining "validity of the relevant market is a factual question reserved for a jury").

---

[5] Even if a reasonable fact finder might conclude that cash-access systems and digital wallets occupy the same overarching market, for all the reasons specified above, they would nevertheless occupy distinct antitrust submarkets.  *See Her Majesty the Queen in Right of Can. v. Van Well Nursery, Inc.*, 2022 U.S. Dist. LEXIS 684, at *21-22 (E.D. Wash. Jan. 3, 2022) (denying motion to dismiss and finding adequately alleged submarket based on products' distinct prices and peculiar characteristics); *see also supra* n.3 (explaining the comparable analysis for markets and submarkets).

[6] Everi argues that two products fall in the same market if they have "actual or potential ability to deprive each other of significant levels of business."  Mot. at 8 (quotation omitted).  But that test, first articulated in *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, applied to "functionally equivalent or identical" products for which there was cross-elastic demand.  875 F.2d 1369, 1374 (9th Cir. 1989).  That is not the case here since, as noted above, cash access and digital wallets are functionally different and demand is not cross-elastic.  Regardless, *Thurman Industries* holds that "[t]his definitional process is a fact inquiry for the jury," *id.*, and thus not something the Court may undertake at the motion-to-dismiss stage.

Nor does one innovative company's attrition from a legacy company—whether Uber from taxis, Amazon from Albertsons, or Koin from Everi—mean that the new and the old are in the same market. Indeed,

> when the automobile was first invented, competing auto manufacturers obviously took customers primarily from companies selling horses and buggies . . . but that hardly shows that cars and horse-drawn carriages should be treated as the same product market. . . . [For this reason], courts have often found that sufficiently innovative retailers can constitute a distinct product market even when they take customers from existing retailers.

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1048 (D.C. Cir. 2008) (Tatel, J., concurring); *accord Hughes Tool Co. v. Ford*, 114 F. Supp. 525, 536 (E.D. Okla. 1953) ("No one would question the legal impropriety of a single automotive manufacturer dominating the sale and distribution of all automobiles, even though the purchasing public could always substitute the horse drawn wagon or buggy in the event the prices of automobiles were raised to exorbitant figures."); *see also Pinnacle Sys., Inc. v. XOS Techs., Inc.*, 2003 U.S. Dist. LEXIS 27729, at *21-22 (N.D. Cal. May 19, 2003) (denying dismissal on market definition grounds because it is reasonable "that those in the market for a 'sports video editing system' would not consider analog tape splicing . . . as comparable to a customized, integrated, state of the art digital video editing system").

"[E]ven though the same products"—funds for gaming—"may be available [from] both," cash-access systems and digital wallets are not in the same market. *Frame-Wilson*, 591 F. Supp. 3d at 990. Given the ample economic and practical factors showing separate cash-access and digital-wallet markets, the Court should deny Everi's motion to dismiss for failure to allege plausible markets. *See Klein*, 580 F. Supp. 3d at 773 ("[A]ll that is required at the pleading stage is a qualitative description of the product market which shows that 'certain factors' of both the [product] at issue and its potential substitutes—e.g., their 'price, use[,] and qualities'—render them not 'reasonably interchangeable' in the eyes of users." (second alteration in original) (quotation omitted)).

## II.   EVERI HARMS DIGITAL-WALLET COMPETITION BY LEVERAGING ITS CASH-ACCESS MARKET POWER TO FORCE USE OF ONLY ITS WALLET.

Although Everi has publicly touted a tying strategy to leverage its existing cash-access customers into digital customers, Compl. ¶ 16, it defends this anticompetitive conduct on three grounds.  First, Everi—the self-described "dominant market leader" for gaming cash-access systems, with more than 75% market share, *id.* ¶¶ 3-4—defends its anticompetitive conduct by arguing that "Koin [does not] allege sufficient facts to plead market power," Mot. at 14.  Second, despite deceptive form contracts by which Everi's "cash-access customers are prohibited from using any digital wallet but Everi's," Compl. ¶¶ 17, 113, Everi insists it has not forced an anticompetitive tie on its customers, Mot. at 12.  Third, while Koin has alleged that Everi "ports its dominance" over cash-access markets to the digital-wallet markets, Compl. ¶¶ 22, 184, 217, 224-225, Everi argues that Koin's allegations do not show even a "*de minimis*" effect on competition for digital wallets, Mot. at 16-17.  Put simply, Everi fails to engage Koin's allegations.[7]

### A.   Everi Dominates the Cash-Access Markets.

Koin has shown Everi's cash-access market power both circumstantially and directly.  The requisite economic or market power "is the power to force a purchaser to do something that he would not do in a competitive market," and it "ordinarily is inferred from the seller's possession of a predominant share of the market."  *Kodak*, 504 U.S. at 464 (quotation omitted).  In addition to Everi's own proclamations of predominance in the cash-access markets, Compl. ¶¶ 4, 52, 133, Koin alleges that Everi controls roughly 75% to 90% of cash-access transactions, *id.* ¶¶ 3, 53, 208; *see also id.* ¶¶ 134-136, 184, 225.[8]  Generally, 30% is "the minimum market

---

[7] Everi's fourth argument in defense of tying—that cash-access systems and digital wallets are the same product—is addressed *supra* Section I.A.

[8] Everi asks the Court to ignore past estimates of its cash-access market share, citing *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F. Supp. 423 (N.D. Cal. 1978).  Mot. at 15.  Setting aside that *ILC* does not stand for the proposition that historical market-share figures must be excluded at the motion-to-dismiss stage, *see* 458 F. Supp. at 431 (entering directed verdict after five-month trial), Koin has not relied on stale estimates.  First, the estimates of Everi's 75-90% market share for cash access originally arose when Everi processed $22 billion of such

14

1  share from which the market power required to be shown at the threshold of a tying case can be

2  inferred." *Hardy v. City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994) (Posner, J.). Koin easily

3  clears this, and its allegations of market share exceeding 75% fall comfortably within a market

4  share that amounts to market power. *See Moore v. Jas. H. Matthews & Co.*, 473 F.2d 328, 332

5  (9th Cir. 1972) (65% share creates fact issues on market power); *Sunkist Growers, Inc. v.*

6  *Winckler & Smith Citrus Prods. Co.*, 284 F.2d 1, 10 (9th Cir. 1960) (70% of market), *rev'd on*

7  *other grounds*, 370 U.S. 19 (1962).[9]

8  In light of Everi's clear dominance and its evident ability to exclude competition through

9  its indefinite exclusivity arrangements, Compl. ¶¶ 116-117, barriers to entry need not be alleged

10 to prove market power, *see Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245,

11

12 transactions in a casino-gaming market with net revenues of about $32 billion, whereas the last
   reported year showed Everi transactions of about $40 billion in a casino-gaming market with

13 about $45 billion in net revenues. Compl. ¶¶ 4, 52-54. Contrary to Everi's contentions, Mot. at
   15 n.4, this not only shows that dollars supplied by Everi's systems make up almost 90% of the

14 net revenue won by casinos from gaming—and it is implausible to infer that patrons are paying
   as much as 20% in fees for cash used anywhere off the casino floor, Compl. ¶ 124—but it also

15 shows that the proportion of casino-gaming revenues covered by Everi transactions has gone *up*.
   Moreover, Koin's allegation that Everi controls 75-90% of the cash-access market is not

16 exclusively tied to past estimates but is corroborated by Koin's own survey of the ten largest
   casino operators. In all events, Everi concedes the relevant question is whether it "owns a

17 dominant share" of the cash-access market, and Everi has publicly admitted as much. Mot. at
   15; Compl. ¶¶ 4, 52.

18 [9] In passing, Everi disputes that its overall share of cash-access transactions is the relevant metric
   for assessing its market power. Everi relies, however, on a case that supports a different

19 proposition: alleging merely that a defendant is the top seller in the market is insufficient
   because, among other reasons, the top seller in a highly diffuse market may have only a small

20 fraction of that market—in that case, only 13% was alleged—while still controlling more than
   any other single seller. *See* Mot. at 15 (citing *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,

21 532 F.3d 963, 972 (9th Cir. 2008)). True enough, but that has no application here, where Koin
   alleges Everi's share of total transactions—a dominant 75% or more.

22 To the extent Everi challenges the use of transaction-share rather than the use of casino-share,
   Everi also overlooks allegations related to casinos. Compl. ¶¶ 2, 53 (contracts with

23 "overwhelming majority of casino operators"—"more than 1,110 casinos, including the ten
   largest gaming companies in the United States"). But at base, Everi's critique is backward. For

24 example, Everi could have contracts with 75% of U.S. casinos yet control only a fraction of
   transactions if those contracts were with the bottom three quarters of casinos. In economic

25 terms, the measure that best describes Everi's ability to raise prices and restrict output is its share
   of overall transactions. *See Moore*, 473 F.2d at 332 (using percentage of burials rather than

26 percentage of cemeteries to assess market power in burial-marker market); *Hardy*, 39 F.3d at 767
   (noting that share of optometry stores does not inform the relevant assessment of the share of

27 contact lens specifications written).

1254-55 (9th Cir. 1990) (summary judgment for defendant inappropriate where plaintiff showed
sufficient market share and ability to exclude competitors, despite "no barriers to entry"). But
Koin *has* alleged barriers to entry. First, of course, is Everi's network of indefinitely exclusive
contracts designed to "restrict new entrants to the market." *Dairy, LLC v. Milk Moovement, Inc.*,
2023 U.S. Dist. LEXIS 83790, at *25-26 (E.D. Cal. May 12, 2023); *compare id.*, *with W. Parcel
Express v. UPS of Am., Inc.*, 190 F.3d 974, 975-76 (9th Cir. 1999) (holding that exclusivity
provision that was terminable at will with minimal notice was not a barrier); Compl. ¶¶ 2, 17,
116-117; *see also id.* ¶ 197 ("[T]he staggered nature of [Everi's] long-term exclusive contracts
imposes tremendous startup costs on any would-be competitor . . . who must ride out the initial
five years of Everi contracts just to get a single crack at each casino . . . ."). Second, "'regulatory
requirements to sell'" cash-access systems to casinos impose significant costs and delays on new
market entrants and exclude would-be competition by foreign companies and general
financial-services firms like banks and credit unions. *See Safeway Inc. v. Abbott Lab'ys*, 761
F. Supp. 2d 874, 889 (N.D. Cal. 2011) (quoting *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
386 F.3d 485, 499 (2d Cir. 2004)); Compl. ¶¶ 6, 48, 51, 153-154, 156; *cf. id.* ¶¶ 198, 200.

Alternatively, Koin has alleged direct evidence of Everi's market power over cash access
in casinos. The nub of this case is Everi's ability to restrict output through indefinite
exclusive-use agreements for digital wallets. *See DAT Sols., LLC v. Convoy, Inc.*, 2023 U.S.
Dist. LEXIS 70734, at *48 (D. Or. Apr. 24, 2023) (assessing exclusive-use agreements as a
means to "limit[] the capacity of existing competitors to expand output in the relevant market").
Everi's exclusive cash-access contracts with the "overwhelming majority of casino operators"
give Everi the ability to restrict marketwide output by limiting its own output in the 75%+ of the
cash-access transactions it controls—an outcome Everi's customers would not accept in the
absence of Everi's market power. Compl. ¶¶ 2, 115-117, 209; *see also id.* ¶¶ 143-144, 193
(alleging how cash-to-digital-wallet tying agreements restrict output from competitors).

Everi's ability to maintain dominance while providing a substandard cash-access
product—one that patrons and casinos would prefer not to use, *id.* ¶¶ 182, 212-213—is also

1   direct evidence of Everi's market power, *see Las Vegas Sun, Inc. v. Adelson*, 2022 U.S. Dist.

2   LEXIS 53023, at *24 & n.8 (D. Nev. Mar. 23, 2022) (market power adequately alleged based on

3   "reduced output, increased prices, or *decreased quality*" (emphasis in original) (quoting *Ohio v.*

4   *Am. Express Co.*, 585 U.S. 529, 542 (2018))).  So too is Everi's control of pricing in at least 75%

5   of the market and Everi's use of that control to impose supracompetitive fees—at least two to

6   three times what a patron would pay to obtain cash in a competitive cash-access market—

7   generating a staggering 95% margin from its cash-access business that obviates the need even to

8   show restricted output.  Compl. ¶¶ 123-124, 126-128, 182, 208-211, 213; *see Epic Games, Inc. v.*

9   *Apple, Inc.*, 67 F.4th 946, 971, 984, 998, 1002 (9th Cir. 2023) (affirming market-power finding

10  based on direct evidence of "extraordinary high" operating margin of 75% and noting that high

11  margin obviates need to show restricted output).  Koin has alleged direct and circumstantial

12  evidence of Everi's cash-access market power.[10]

### B.      Everi Forces All Its Cash-Access Customers to Use Its Digital Wallet.

14          Tying arises when a party agrees to sell something only on the *condition* that the buyer

15  agrees to purchase or not purchase something else.  Everi contends that Koin fails to establish the

16  conditional element of a tying claim, but it fails to account for its own admissions, namely that

17  "any current customer of Everi's cash access services [is] required to use the Everi CashClub

18  Wallet."  Ex. A, Everi State FAC at 4 ¶ 21; *see also* Compl. ¶¶ 16, 218 (alleging Everi's specific

19  intent to tie).  That is conditional tying in a nutshell.

20          Everi also fails to grapple with the concept of negative tying.  *See Crownalytics, LLC v.*

21  *Spins LLC*, 2023 U.S. Dist. LEXIS 72072, at *23-27 (D. Colo. Apr. 25, 2023) (negative tying

22  occurs "when the customer promises not to take the tied product from the defendant's

23  competitor" (quotation omitted)).  Specifically, "a tying arrangement may be defined as an

---

[10] The ability to maintain market share while offering a substandard product or reaping unusually
high margins has also been treated as circumstantial evidence of market power.  *Byars v. Bluff
City News Co.*, 609 F.2d 843, 850-51, 853 n.26 (6th Cir. 1979) (reversing defense judgment on
market power grounds based on assessment of market share and other circumstantial evidence,
including maintenance of market share with inferior service); *Borden, Inc. v. FTC*, 674 F.2d 498,
511-12 (6th Cir. 1982) (recognizing "ability to command a premium price" as an indication of
market power), *vacated on other grounds*, 461 U.S. 940 (1983).

agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product," but a tying arrangement *also* may arise from forcing the buyer to "agree[] that he will not purchase that product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958); *see also Kodak*, 504 U.S. at 463 ("[R]espondents have presented sufficient evidence of a tie between service and parts. The record indicates that Kodak would sell parts to third parties only if they agreed not to buy service from ISO's."); *Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 648 (9th Cir. 1981) (reversing dismissal of tying claim where plaintiff alleged defendant required health-plan customers to purchase drugs, if at all, through defendant); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426 (9th Cir. 1995) (reversing defense judgment on tying claim where plaintiff showed that defendant "would not provide software service if [plaintiff's would-be customer] purchased hardware service from a third party" like plaintiff).

Everi does not reckon with negative tying, which Koin expressly alleges in the Complaint:

> As relevant here, Everi has executed a tying strategy by which it imposes on casinos a complex, exclusive adhesion contract for cash-access products—lasting for a minimum of five years with automatic renewals, rights of first refusal, and onerous forfeiture provisions—and sneaks or otherwise forces its cashless or "quasi-cash" products into the long-term exclusive arrangement, as a condition to receiving Everi's cash-access products.

Compl. ¶ 17.[11]

Everi also argues that there are no allegations suggesting that it conditioned the sale of its cash-access system on a tie-in with digital wallets, meaning that the tie was not sufficiently coercive. Mot. at 13. But "the fact of the existence of tying language [in a contract] is enough to evidence a tie [since such language by itself has considerable 'coercive potential,' and evidence

---

[11] Everi appears to dispute that negative tying is a valid antitrust theory, citing *Collier v. New York*, 2006 U.S. Dist. LEXIS 111127 (C.D. Cal. Nov. 1, 2006), for the proposition that Koin had to allege that Everi "refused to sell other cash-access services to a casino unless that casino also agreed to purchase digital wallet services." Mot. at 13. But *Collier* held nothing of the sort, only that there was no tie where a customer "purchased a refrigerator and stove" and "then separately and voluntarily purchased a service and repair agreement." 2006 U.S. Dist. LEXIS 111127, at *14-15.

that it was actually enforced is not necessary." *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (quoting *United States v. Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1381-82 & n.17 (N.D. Cal. 1981)); *accord Advance Bus. Sys. & Supply Co. v. SCM Corp.*, 415 F.2d 55, 66 (4th Cir. 1969) ("[T]he tying arrangement is no less invalid when it is written into a formal contract than when it is imposed by means of coercive or fraudulent practices."); *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 250 & n.9 (E.D. Mich. 1996) ("[W]here there is an express contractual tying arrangement, or where the practical economic effects flowing from the contract clauses and other common proofs establish a tie, individual proof of coercion is not necessary . . . .").[12]  According to Everi, the cash-access contracts at issue make it the "sole and exclusive provider" of digital wallets and preclude the customer from "allow[ing] any other party to provide any service that is substantially similar" to digital wallets.  Compl. ¶¶ 115, 131.  That express agreement is enough.  *See Mozart*, 593 F. Supp. at 1517.

That this express agreement is part of Everi's standard form only enhances its coercive nature.  *See Anderson Foreign Motors, Inc. v. New Eng. Toyota Distribs., Inc.*, 475 F. Supp. 973, 988-89 (D. Mass. 1979) ("Coercion may have some relevance for proving the tie in some situations, but [where] the tie is manifest in the express terms of a standard form contract, independent proof of individual coercion is entirely unnecessary.  This appears to be the approach of a majority of courts.").  Moreover, Everi has demonstrated active coercion through its enforcement of the contract.  Compl. ¶¶ 105-113.[13]

___

[12] Everi cites *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1415 (11th Cir. 1987), for the unremarkable proposition that "two products . . . sold together in the same package" do not demonstrate a tie.  Mot. at 12.  But *Tic-X-Press* also stands for the proposition that even contracts that fall "slightly" short of fully excluding competitors in the tied market may still be coercive.  815 F.2d at 1416-17.  The case cited by Everi as a companion to *Tic-X-Press* articulates the other side of the rule: where a customer is "free to purchase" the supposedly tied product "from others without adverse consequences," there can be no tie.  *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1181 (1st Cir. 1994).  As noted above, the tie here is fully exclusive.

[13] Everi's coercive enforcement of its contracts blurs the distinction between affirmative and negative tying in this case.  The agreement here can be construed as expressly forcing a negative tie, since Everi forces its cash-access customers not to buy digital wallets from other providers.

**C.      By Leveraging Its Cash-Access Products, Everi Ties Up a Not Insubstantial Amount of Digital-Wallet Commerce—More Than Half the Market.**

Although Koin has identified multiple casinos and digital-wallet providers that Everi has harmed with its tying scheme and, more generally, alleged that this conduct affects "the overwhelming majority of casino operators" across the country, *id.* ¶¶ 2, 29, 108-113, 167, 228-238, Everi contends that Koin has not made out allegations to show a sufficient effect on commerce or competitive harm, Mot. at 16.  Again, Everi fails to grapple with the pleadings.

In addition to a conditional agreement, a tying claim requires a showing that a "not insubstantial" amount of commerce in the tied product—here, digital wallets—is affected. *N. Pac. Ry.*, 356 U.S. at 11.  In terms of dollar volume, this requires that something more than a "*de minimis* [amount of business] is foreclosed to competitors by the tie." *Fortner*, 394 U.S. at 501.  Here, Koin has alleged tens of millions of dollars in its own lost profits based on Everi's tying scheme, Compl. ¶¶ 238, 252, 262, which does not account for sales revenue before costs or the sales of other digital-wallet providers, all of which are considered in determining whether more than a *de minimis* amount of commerce has been affected, *Fortner*, 394 U.S. at 502 (observing that a single "individual purchaser who accounted for only a fraction of [a] $500,000" sales market would be "worthy of judicial scrutiny" and explaining that a few million dollars (in 1960s money) in affected sales "could scarcely be regarded as insubstantial").  This case clearly pertains to a not insubstantial volume of commerce in the digital wallet markets affected by Everi's tying arrangements.

For Koin's *per se* tying claim, the Court need not go further to assess actual conditions of market competition, *see Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 998-99 (N.D. Cal. 2010), but for the rule of reason claim, Koin also has alleged the anticompetitive effect of Everi's tying scheme on the digital-wallet markets, *see CollegeNet, Inc. v. Common*

---

And while digital wallets did not exist when Everi executed some of its earliest form contracts, like the one with Baldini's, Mot. at 13, *now*, in the way Everi *enforces* its purported contract rights, it is implementing its tie by affirmatively forcing use of its wallet, Compl. ¶¶ 105-113.  In this sense, Everi's tying scheme is also an affirmative tying arrangement.

*Application, Inc.*, 355 F. Supp. 3d 926, 949-50 (D. Or. 2018) (allegations of reduced output and decreased quality sufficient to establish anticompetitive effects); Compl. ¶¶ 181-185. Indeed, Everi itself has proclaimed that every one of its cash-access customers—who altogether represent more than three quarters of all cash-access transactions in casinos—must "use the Everi CashClub Wallet." Ex. A, Everi State FAC at 4 ¶ 21; *see also* Compl. ¶¶ 184, 208-213, 215-217 (alleging that Everi has ported dominant market share of the cash-access markets—75% to 90%—to the digital-wallet markets). Everi thereby enjoys near-monopoly power in the digital-wallet markets. Compl. ¶¶ 218-224. More specifically, Everi is close to controlling—and after its forthcoming merger will control—upwards of 75% of the digital-wallet markets. *Id.* ¶ 225. Everi forces the majority of casinos and patrons to either (i) swallow uncompetitive terms and higher prices for a substandard digital wallet or (ii) forgo digital-wallet use entirely. *Id.* ¶¶ 105-113, 142, 172, 228-232; *see also id.* ¶¶ 80-97, 220-224 (comparing features and pricing between Everi's wallet and excluded alternatives). As a result, Everi is harming competition, consumers, and competitors by excluding better digital-wallet alternatives from the marketplace that, as a result, is far from "vibrant." Mot. at 17.

Contrary to its contentions, Everi has forced its digital wallet on casinos who wish to use its cash-access system, affecting millions of dollars of commerce and excluding competition for the majority of digital-wallet transactions. Koin has adequately alleged the effects and anticompetitive harms of Everi's tying scheme.

## III.  EVERI'S INDEFINITE EXCLUSIVE AGREEMENTS SUBSTANTIALLY FORECLOSE COMPETITION WITHOUT JUSTIFICATION.

Everi insists that Koin cannot make out "substantial foreclosure" of the digital-wallet markets through exclusive dealing because, contrary to the Complaint, Everi argues that services under its "standard-form" contract "may or *may not* include digital-wallet services." Mot. at 17-19. As noted, however, Everi elsewhere admits that, by virtue of its "Exclusivity Rights," "any current customer of Everi's cash access services [is] required to use the Everi CashClub Wallet," Ex. A, Everi State FAC at 4 ¶ 21. Koin alleges the same thing. Compl. ¶ 131. This

arrangement gives Everi near-monopoly power in the digital-wallet markets, which is far more than substantial foreclosure. *Id.* ¶¶ 191-193, 215-226. Substantial foreclosure from an exclusive-dealing scheme generally means foreclosure of more than 30% to 40% of the market. *See Patt v. Antech Diagnostics, Inc.*, 2020 U.S. Dist. LEXIS 160220, at *16-17 (C.D. Cal. May 18, 2020) (collecting cases). Koin has more than met that standard. Compl. ¶¶ 207-210, 215-217 (alleging cash-access transaction market share of 75-90% ported to digital wallets).[14] Koin has also alleged direct evidence that Everi has substantially foreclosed competition and thereby wields market power over output, price, and quality of digital wallets. *Id.* ¶¶ 220-224, 228-232.[15]

Everi also contends that Koin has not alleged exclusive dealing outside of two contracts, Mot. at 18, but this cribbed reading of the Complaint ignores Everi's own admissions, described above, and is inaccurate. Koin alleges that Everi wields the standard-form contract that it leveraged to foreclose Koin and rival competitor Pavilion from the digital-wallet markets "[a]cross the country." Compl. ¶¶ 108-113; *accord id.* ¶¶ 2, 29, 185 (alleging majority of casinos subject to Everi's exclusive contracts). Indeed, "Everi's exclusive contracts are so widespread among casinos in the U.S. Casino Digital-Wallet Market that patrons have few, if any, other options for digital wallets within the Local Patron Digital-Wallet Markets." *Id.* ¶¶ 187-193; *see also id.* ¶¶ 114-121, 130-132 (alleging details of Everi's standard-form contract).[16]

---

[14] Everi is incorrect that "substantial foreclosure" requires a showing that it has locked up 100% of the market such that Koin cannot remain in any part of it. Mot. at 20 & n.6. That is not what the non-precedential memorandum opinion stands for in *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (holding that plaintiff who could reach customers without a broker could not allege substantial foreclosure based on defendants' alleged foreclosure of four brokers). Everi has foreclosed more than half of transactions in the digital-wallet market for which Koin and other providers cannot compete. That is substantial foreclosure.

[15] Everi demands allegations about its competitors' market shares, but at this stage, Koin is "not required to identify every alleged competitor in its pleadings," let alone their market share. *Klein*, 580 F. Supp. 3d at 765 (quotation omitted). Moreover, Koin has alleged that all of Everi's competitors together control less than 30% of the relevant market. Compl. ¶¶ 207-210, 215-217.

[16] Relatedly, Everi argues that Koin has failed to allege that Everi's dominance of cash-access markets is coextensive with its dominance of digital-wallet markets. Mot. at 19 n.5. But Koin has alleged precisely that. Compl. ¶¶ 22, 184, 217.

Finally, Everi argues that Koin has failed to allege facts showing that Everi's competitors—including Koin—are "significantly limited" by its exclusive contracts.  Mot. at 19-20.  This argument directly contradicts extensive allegations about the onerous and byzantine limitations that Everi's form contract imposes on competition.  The "Everi Contracts" "appoint[] Everi as the 'sole and exclusive provider'" of "quasi-cash" for the contracting customer, which Everi reads to include *cashless* digital wallets.  Compl. ¶¶ 115, 131.  That exclusivity lasts "for an initial term of five years, with automatic renewals for subsequent three-year terms unless either party elects not to renew."  *Id.* ¶ 116.  Plus, Everi has a "right of first refusal to provide the applicable systems to the contracting casino" even after it opts out of an automatic renewal, in effect giving Everi "the right to continue its contracts indefinitely, and the contracting casinos have no ability to cease the relationship unless Everi agrees."  *Id.* ¶¶ 116-117.  In this way, any digital-wallet provider hoping to compete in Everi's exclusive territory "must ride out the initial five years of Everi contracts just to get a single crack at each casino."  *Id.* ¶ 197.  For Koin, Pavilion, and other digital-wallet providers, this has foreclosed otherwise ripe opportunities to compete.  *Id.* ¶¶ 107-113.

Five-year exclusivity agreements covering upwards of 75% of the digital-wallet markets are nearly "unprecedented in terms of their length and coverage of the market."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 265 (3d Cir. 2012) (affirming exclusive-dealing jury verdict).  The Court should reject Everi's effort to shield its anticompetitive agreements.

## IV. <u>PATRONS AT CASINOS UNDER CONTRACT WITH EVERI UNWITTINGLY LOCK INTO AN AFTERMARKET THEY CANNOT REASONABLY LEAVE.</u>

Aside from Koin's aftermarket allegations, Everi does not challenge the Section 2 claims on any grounds other than those raised in connection with Koin's Section 1 claims.  Mot. at 21.  As to Everi's challenge against the digital-wallet aftermarket for Everi-aligned casinos, Koin alleges the sort of low-information market with economically unreasonable switching costs that courts have accepted to establish single-brand aftermarkets.